W. E. WEBSTER *et al. v.* JAMES C. HARRIS *et al.*

(*Jackson,* April Term, 1902.)

1.. **NAVIGABLE STREAMS.** In the technical and legal sense defined.

The test of a navigable stream in the legal and technical sense is whether or not in the ordinary state of water, it has capacity and suitability for the usual purposes of navigation, ascending and descending, by sea vessels, or such vessels as are employed in the ordinary purposes of commerce, whether foreign or inland, and whether steam or sail vessels. (*Post, pp.* 675-677, 687, 698.)

Cases cited and approved: Stuart v. Clark, 2 Swan, 9; Sigler v. State, 7 Bax., 493; Holbert v. Edens, 5 Lea, 207; Goodwin v. Thompson, 15 Lea, 209.

2. **SAME.** Rights of riparian owners in streams navigable in the legal sense, in the ordinary sense, and not in any sense stated. and distinguished.

If a river be a public navigable stream in the legal and technical sense, the soil covered by the water, as is the use of the stream, belongs to the public; but if it be not navigable in the 'legal and technical meaning of the term, the ownership of the bed of the stream is in the riparian proprietors, and the public have an easement only therein, for the purpose of transportation and commercial intercourse, to which it is naturally adapted; if it be too shallow for such purposes, both the right of property and the use thereof are wholly and absolutely in the owners of the riparian lands. (*Post, pp.* 676-677, 698.)

Cases cited and approved: Stuart v. Clark, 2 Swan, 9; Sigler v. State, 7 Bax., 493; Holbert v. Edens, 5 Lea, 207; Goodwin v. Thompson, 15 Lea, 209; Irwin v. Brown, 3 Shannon's Tenn. Cases, 309.

Webster v. Harris.

3. **SAME. Streams navigable in the ordinary sense.**

Streams not navigable in the legal and technical sense may yet be navigable in the common acceptation of the term, where in certain stages of the water it may be of sufficient depth naturally for valuable floatage, as for rafts, flatboats, and perhaps small vessels of lighter draft than the ordinary. (*Post*, *pp*. 676-677.)

Cases cited and approved: Stuart v. Clark, 2 Swan, 9; Sigler v. State, 7 Bax., 493; Holbert v. Edens, 5 Lea, 207; Goodwin v. Thompson, 15 Lea, 209.

4. **SAME. Right of riparian owners in streams navigable in the ordinary sense.**

While the right of property in the bed of a stream navigable in the ordinary sense, but not in the legal sense, is vested in the riparian proprietors, and in that respect it is to be regarded as a private river, still the public have a right to the free and uninterrupted use and enjoyment of such stream for all purpose of transportation and navigation to which it is naturally adapted. (*Post, pp*. 676-677, 698.)

Cases cited and approved: Stuart v. Clark, 2 Swan, 9; Sigler v. State, 7 Bax., 493; Holbert v. Edens, 5 Lea, 207; Goodwin v. Thompson, 15 Lea, 209.

5. **SAME. Bed of stream navigable in the legal sense held by State in trust for the public.**

If a stream is navigable in the legal and the technical sense, the title of the soil under the water is vested in the State in trust for the public, and individuals setting up claims thereto must be able to show an express grant by an act of the legislature; for the title to the soil under such streams was not intended to be secured by individuals under our general land laws. (*Post*, *pp*. 677, 687, 695, 703-704.)

Case cited and approved: Goodwin v. Thompson, 15 Lea, 209.

6. **SAME.** Navigability determined from existing conditions and not from artificial improvements to be made.

The crucial test in determining the navigability of a stream is whether it is naturally navigable at the time of the determination, and not whether it is possible to be made so by artificial means and vast expenditure of money at some remote period of the future. (*Post, pp.* 689-695.)

Cases cited and approved: Gaston v. Mace (W. Va.), 10. S. E., 60, 5 L. R. A., 396-399, 25 Am. St. Rep., 848; Olive v. State (Ala.), 5 South., 653, 4 L. R. A., 38-41; Swanson v. Boom Co., (Minn.), 44 N. W., 986, 7 L. R. A., 674; Club v. Wade (Wis.), 76 N. W., 273, 42 L. R. A., 305-330; United States v. Rio Grande Dam & Irrigation Co. (N. M.), 51 Pac., 674; Cates v. Wadlington, 10 Am. Dec., 699.

7. **SAME.** Reelfoot Lake held to be navigable in the ordinary sense only.

Upon consideration of the evidence in this suit to enjoin the draining of Reelfoot Lake, it is held by the supreme court that said lake is not navigable in the legal and technical sense, but is navigable in the ordinary sense, and, therefore, that the land covered by the water thereof was subject to grant, and the title to the bed of the lake is not in the State for the use of the public, but is in the several grantees and riparian owners, though the public still has an easement in said lake for commercial intercourse and transportation. (*Post, pp.* 687-695, 703.)

8. **SAME.** In the ordinary sense as boundary of land carries title to thread or center.

If a stream navigable in the ordinary sense be the boundary of lands, the title extends to the thread or center of the stream, of common right or by construction of law, unless there is an intention clearly expressed in the deed or grant excluding the intermediate space between the edge or bank of the stream and its thread. (*Post, pp.* 698-699, 704.)

Webster v. Harris.

Cases cited and approved: Martin v. Nance, 3 Head, 650; Holbert v. Edens, 5 Lea, 204, 207; Posey v. James, 7 Lea, 99.

**9. NONNAVIGABLE STREAMS. Boundaries limited by deed to edge thereof.**

Where a deed of conveyance of land expressly calls for the water's edge at low water mark for the boundary, the rule that ordinarily applies to the rights of riparian owners in nonnavigable waters does not apply, and the title does not extend to the middle or thread of the stream. (*Post, pp.* 698-699.)

Cases cited and approved: Martin v. Nance, 3 Head, 650; Holbert v. Edens, 5 Lea, 204, 207; Posey v. James, 7 Lea, 99.

**10. STREAMS. Whether navigable or not, must not be impaired.**

One riparian proprietor has no right to drain the stream or reduce it below its natural level, whether it be navigable or nonnavigable, if it impairs or destroys the interest and use of another riparian owner. (*Post, pp.* 699-701.)

Case cited and approved: Ulbricht v. Water Co. (Ala.), 6 South., 78, 4 L. R. A., 573, 11 Am. St. Rep., 72.

**11. SAME. Right protected by injunction.**

The riparian owner may by injunction in chancery protect his riparian rights, and prevent the draining of the stream or its impairment. (*Post, p.* 704.)

**12. EJECTMENT. Land must be located and identified with reference to grant and conveyance.**

Where a cross complainant seeks by ejectment to recover land lying under the waters of a nonnavigable lake by production of grants and conveyances and a map in which the surveyor undertook to plat the tracts, but there was no proof locating the various grants with reference to the lake except such map, and there was no proof of any survey, the location and identity of the particular lands was not shown with sufficient certainty to support the action of ejectment. (*Post, pp.* 703-704.)

## FROM LAKE.

Appeal from Chancery Court of Lake county—W. H. SWIGGART, Chancellor.

COCHRAN, MOORE & WELLS, for Webster.

DEASON, RANKIN & WADDELL, for Harris.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

This case is presented to the court in a most voluminous record, and involves the title, ownership, and navigability of Reelfoot Lake, situated in the northwestern corner of the State. It also involves the hunting and fishing privileges and the general riparian rights of the complainants in the waters of said lake.

In August, 1899, the defendant J. C. Harris, assuming to be the owner of the soil under the waters of the lake, began to excavate a canal for the purpose of connecting the lake with the Mississippi river, and in this way drain the water from the greater portion of the lands comprising the lake. Thereupon complainants, who are owners of lands, hotels, club houses, fish docks, and other property situated along the eastern shore of the lake, filed this injunction bill to restrain the defendant J. C. Harris from draining it. They base their

right to maintain the suit upon the ground that they are riparian owners of certain lands bordering on the lake; that Reelfoot Lake is a public and navigable body of water in a legal sense and as a matter of fact; that as such, under the statutes of the State, it is a public highway; that the obstruction or destruction of its navigability will be a public nuisance, and that the drainage of said lake will create a public nuisance on account of the character of its bottom, which is composed of mud and decaying vegetable matter and thus greatly injure the health of the people in that vicinity.

It is also alleged in the bill that the drainage of the lake would destroy the value of the improvements which complainants have erected upon their lands for the entertainment of guests who visit Reelfoot Lake at all seasons of the year for pleasure and to hunt and fish. It is further alleged that defendant Harris has set up some pretended claim and title to the land under the waters of Reelfoot Lake; that he has declared his purpose to drain the lake; that he has a large number of hands at work digging a canal from the Mississippi river to Reelfoot Lake; and that he will drain the lake, unless restrained by law.

The defendant Harris filed his answer and cross bill, in which all the material allegations of the original bill are denied. It is alleged by said Harris that on December 28, 1898, he purchased from the Reelfoot Outing Club, by deed conveying the title in fee, all the lands covered by the waters of Reelfoot Lake at ordinary low-

111 Tenn—43

water mark. and also all the shores and margins of said lake and of all the islands in the said lake. Defendant alleges in the cross bill that he is the owner of the lake and of all the soil thereunder, and that he has the exclusive right to the hunting and fishing privileges, etc. It is also alleged in said cross bill that the said Harris and his predecessors in title have exercised acts of ownership over Reelfoot Lake under their said titles, and that the validity of the titles under which he claims has been determined in his favor by the supreme court of Tennessee.

The chancellor, Hon. W. H. Swiggart, assigned to hold the chancery court of Lake county, heard the cause upon the pleadings and proof. A very able and elaborate written opinion was filed by the judge, which has greatly facilitated the labors of this court in the investigation of the case.

The result of the chancellor's opinion was to sustain the original bill, perpetuate the injunction restraining the defendant Harris from draining Reelfoot Lake, and to dismiss his cross bill. The court held that the complainants to the original bill are riparian owners, owning tracts of land in severalty along the eastern shore of the lake, with their western boundaries extending to the water's edge at the low-water mark; that they are entitled to the uses, benefits, and privileges of the waters of the lake for all common, usual, domestic, and farm purposes, and entitled to have the waters of the lake continued in their natural state and condition;

that Reelfoot Lake is a public and navigable body of water in the sense of the law as well as in fact, and therefore not the subject of private ownership and control, under the general land laws of Tennessee, but that the soil under said waters and the fisheries therein, as well as the right of navigation, belong to the State, in trust for the benefit of all the citizens thereof; and that the title under which J. C. Harris and his predecessors claim to own Reelfoot Lake is void, and that such title papers confer no title whatever to such of the lands as are covered by water. The court did not determine the title to the islands in the lake, as none of the complainants to the suit are asserting any title thereto. J. C. Harris appealed from the decree of the chancellor and has assigned numerous errors.

The first assignment is that the court erred in holding that Reelfoot Lake is a public and navigable body of water in the sense of the law as well as in fact. Second. The court erred in holding this lake is not the subject of private ownership and control, under the laws of Tennessee, but that the soil under the lake and the fisheries therein, as well as the right of navigation, and all other rights, incidents of property, and easements thereto, belong to the State, in trust for the benefit of the citizens thereof.

It is insisted this holding of the chancellor was erroneous. The test of a navigable stream is whether, in the ordinary state of water, it has capacity and suitability for the usual purposes of navigation. *Stuart* v. *Clark's*

*Lessee,* 2 Swan, 9, 58 Am. Dec., 49. It was further said in that case: "We are aware of no less exceptionable criterion than that to be extracted from some of the cases, namely, a river capable, in the ordinary state of the water, of navigation, ascending and descending, by sea vessels; that is, such vessels as are employed in the ordinary purposes of commerce, whether foreign or inland, and whether steam or sail vessels." Judge McKinney in that case said: "The distinction between the technical sense of the term and its common acceptation is important to be kept in view in inquiring into the respective rights of the public and the riparian owners in reference to the property in the soil, as well as the use of the water courses. . . . If the river be a public, navigable stream in the legal sense, the soil covered by the water, as well as the use of the stream, belongs to the public. But if it be not navigable in the legal meaning of the term . . . the ownership of the bed of the stream is in the riparian proprietor, but the public have an easement therein for the purpose of transportation and commercial intercourse. A distinction is taken by the common law between streams which in the common acceptation of the term are suited to some purposes of navigation and small shallow streams which are not so. In respect to the former— which, though not navigable in the sense of the law, are yet of sufficient depth naturally for valuable floatage, as for rafts, flatboats, and perhaps small vessels of lighter draught than ordinary—while it is settled that

the right of property in the bed of the stream is vested in the riparian proprietor, and in that respect it is to be regarded as a private river, still it is equally well settled that the public have a right to the free and uninterrupted use and enjoyment of such stream for all the purposes of transportation and navigation to which it is naturally adapted."

These principles were reaffirmed by this court in *Holbert* v. *Edens,* .5 Lea, 207, 40 Am. Rep., 26; *Sigler* v. *State,* 7 Baxt., 493; *Goodwin* v. *Thompson,* 15 Lea, 209, 54 Am. Rep., 410. But it was held by this court in *Irwin* v. *Brown,* 3 Shannon's Cas., 310, that a stream which is not of sufficient depth naturally for valuable floatage, such as rafts, flatboats, and small boats of lighter draught than ordinary, is not navigable in either a strict legal sense or ordinary sense. Hence it was held that capacity to float a saw log in Hind's creek to a river was not a test of the navigability of said creek. To the same effect is *Allison* v. *Davidson,* 39 S. W., 905, decided by the court of chancery appeals, and affirmed by this court. It was held in *Goodwin* v. *Thompson,* 15 Lea, 209, 54 Am. Rep., 410, that, if a stream is navigable in a legal sense, the title to the soil under the water is in the State, in trust for the public, and individuals setting up a claim thereto must be able to show an express grant by an act of the legislature; and that the title to the soil under such streams was not intended to be secured by individuals under our general land laws. With these definitions and principles in view, we pro-

ceed to inquire if the facts disclosed in this record es-- tablish that Reelfoot Lake is a navigable body of water in the legal sense, as held by the chancellor. The following diagram is shown to be an accurate representation of the shape of the lake, its basins, boundaries, tributaries, etc., and will serve to illustrate the bearing of the facts established by the evidence:

The origin, history, and description of the lake is given in the following extract, which we take from the very able and learned opinion of Judge W. H. Swiggart, viz.:

"The proof shows that Reelfoot Lake is a large body of water, lying in the northwest corner of the State of Tennessee, in both Obion and Lake counties, mainly, a small portion of it, consisting of one thousand acres, or more, being in the State of Kentucky; that portion in Kentucky being certain arms or pockets of the main lake. The lake covers about 25,000 or 30,000 acres of submerged land, not including the arms or pockets, which cover several hundred more. It is about 15 or 20 miles long, and from 2 to 7 miles wide, being of irregular shape. It has several islands in it, which together cover about 1,500 acres. There are also two large promontories or points of land extending into the lake, which are sometimes called islands, to wit, Grassy Point, on the eastern shore, and Horse Island (so called), on the western shore. The head of the lake is at the north, near the Tennessee and Kentucky line, and only about three miles from the Mississippi river. Its course is to the south and somewhat west; and, after passing round Madrid Bend, the river comes back to within two and one-half or three miles of the western shore of the lake at Tiptonville, the county seat of Lake county.

"The natural outlets of the lake are at its southern end, and consists of sloughs and bayous, sometimes

called the 'Scatters' or 'Narrows' of the lake. These carry its waters on south into and through other smaller basins or lakes, and on through other sloughs and bayous into the Obion river, at a distance of about fifteen miles from the main body of the lake, and thence through that river into the Mississippi river. This lake was formed by the earthquake or series of earthquakes which occurred in the winter of 1811 and 1812, and which were known to have seriously affected that portion of the country near the old Spanish town of New Madrid, just across the Mississippi river in the State of Missouri. At that date it was a forest of wild land, covered with timber.

"The small streams called 'Reelfoot River' and 'Bayou De Chein,' passed through the territory now composing the basin of the lake, and came together at a point now in the lake towards its eastern and southern shore, perhaps three-quarters of a mile from its eastern bank at the village of Samberg. Reelfoot river enters the lake on its eastern shore, towards the northern end, and Bayou De Chein enters the lake near its extreme northeastern corner, and bears to the southwest, and then back across the lake towards the eastern side, where it empties into Reelfoot river. The course of Reelfoot river is along nearer the eastern bank, towards the south, at the point of confluence above mentioned. From this point the river bears on south and west to the western edge at a point near Campbell's store called 'Blue Bank Bayou,' where the old channel leaves the lake, and

goes on westward towards the Mississippi river, not be-
ing at this date, nor since the formation of the lake, a
running stream. There are other smaller streams which
flowed across said lake, or into it, and whose waters
empty into the lake still. The channel of these streams,
Reelfoot river and Bayou De Chein, are still traceable
through the waters of the lake, the waters being deeper
than at other points, as a rule, and the beds being freer
from stumps and logs than other places.

"It is not shown directly the length of these streams
in the lake, but inferentially, I should think, from the
proof, that the Reelfoot channel is twenty or thirty
miles and the Bayou De Chein is twelve or fifteen miles
in the lake, following their courses. The lake is now
from two feet to eighteen feet deep, the depth varying
at different places. There are many places near the
shores where the water is only a few inches in depth.
But in the channels of these water courses (as they for-
merly existed) the average depth of the water is from
four to ten feet, in many places deeper, and in one or
two places not so deep, especially at Brewer's Bar,
which has formed across Bayou De Chein, in the upper
part of the lake. In many other places there are deep,
open basins, comparatively clear of stumps and logs,
and where the water is from twelve to twenty feet deep.

"There are many logs and trees and stumps in said
lake, being dead cypress mainly. Many of the trees
which stood in it when the land was first submerged
have fallen, and the logs lie on the bottom or in the

water. Many of them have rotted off at the water's edge, and the stumps still stand, some of them hidden by the water, and others above the water. Many of the logs have been washed out and drifted to the southern end, and filled up Broad Slough, one of the outlets of the lake. The extent and depth given above of the lake are what I think the proof shows it to be at ordinary low water, when it is in its ordinary and natural condition. The lake is fed by the streams I have referred to, and by Indian creek, and by many springs which flow into it from the chain of bluffs along its entire eastern shore. Indian creek and Reelfoot river and many of the springs are perennial; others go dry in summer; and it is a disputed question whether Reelfoot river does or not flow all the year round. But the proof is that it flows substantially all the year. If it has ever ceased to do so, it is only rarely, and when the season is unusually dry, and for only a short time.

"The lake is subject to overflows from the Mississippi river. The ground between the river and the head of the lake is low, and in great rises in that river its waters overflow all the country round, and fill up the lake to the depth of ten or twelve feet above its ordinary stages. This occurs generally once a year, but not always. After such flood it gradually runs down to its normal condition, the water remaining higher than is usual until summer, or late spring. The water, except when flooded by such overflows from the Mississippi, is clear and comparatively pure. It is transparent. It

is wholesome, and is used by the people for drinking, cooking, watering stock, etc. The lake is also supplied with an abundance of the finest species of fresh-water fish, which are taken in great quantities for food, and many of which are shipped to the various markets and sold; there being, perhaps, according to the proof, four hundred or five hundred men and their families who are making their living by fishing in this lake. It is claimed by one witness that the fishing done amounts to perhaps $200,000 per year. However this may be, it is shown that quite an extensive business of this sort is carried on. This fishing is done in various ways, nets and seines, as well as hooks and lines, being used; and the fish are taken out in skiffs, generally, and carried to shore, where docks have been built and maintained to receive them.

"It is also shown, and not denied, that said lake has for a long time been a famous and favorite resort for sportsmen for hunting wild fowls and for fishing thereon. It is shown also by a preponderance of the evidence that the lake is gradually filling up at some places, especially at the mouth of Reelfoot river, and at the mouth of Indian creek, and at certain points along the western shore, as the result, perhaps, of sediment washed into it by the waters of these streams and by the overflows from the Mississippi. But while it is asserted by some witnesses that the lake has filled up several feet generally, and does not cover so much land now as formerly by perhaps one-fourth or one-fifth, I do not

think the proof as a whole sustains the contention. The recession of the waters seems to have been greater on the Lake county shore, and even there I do not find that it has receded more than one hundred yards, or about that, in the places of greatest recession, and in other places on that shore it has receded only a few yards and in still others none. While on the east bank there appears to be some land formed by accretion at the mouth of Reelfoot river and at the mouth of Indian creek, the proof does not show the exact amount of such accretions or derelictions at these places; and at other places on the eastern shore there is no such definite proof on the subject as will warrant the court in holding that the waters have permanently receded, leaving relicted land or accretions upon the former banks. Indian creek empties into the lake from the eastern shore at the village of Samberg, formerly called 'Wheeling,' or just north thereof.

"The proof shows that the lands north and west of this lake, and south and also east for a short distance out to the bluffs which run along this shore all overflow from the Mississippi to the depth of 5 to 15 feet; that said lands in Lake county, and in Kentucky, and at the Narrows, and many on the east are still in the woods and unimproved. But along the eastern shore, and especially where complainants claim land, the lands fronting on the lake are cleared and in cultivation. Many of these have been so for a great number of years. There is no perceptible current in said lake, except at times

when it is flooded from the river, although there is a constant flow of water into and out of the lake; but the quantity is not sufficient, ordinarily, to cause any apparent current in the lake, not even in the channels aforesaid. The waters are not stagnant, but are kept pure and clear by the winds and other natural causes. In the shallow places there is a growth of cut grass, waukapins [mancopins or yoncopins], and other vegetation natural to wet lands in this climate. In extreme low water the land in the arms and pockets and around the shores in shallow places becomes dry, the water temporarily leaving such places exposed.

"It will be seen from these statements of the pleadings and this summary of the physical facts concerning this lake, that the principal question to be decided is whether the lake is a public navigable body of water which belongs to the State for the use of the people, including the title of the soil, and the fisheries appertaining to it, as well as the right of navigation; or whether, if not so, then it is navigable in such qualified sense as to give the public an easement in it for the purposes of navigation and commercial intercourse only, while the soil under its waters and fisheries are the property of the riparian owners or others to whom it may be granted by the State; and, if the latter be its legal status, then whether the complainants are in fact riparian owners on its shores and banks, and the extent of their titles and rights in the lake as to the soil under it and the waters and fisheries therein, and whether the defendant

Harris has acquired the sole proprietary rights in the soil under the water and in the fisheries thereof."

With this admirable statement of the case made by the learned chancellor, we proceed to inquire whether, upon the facts found in the record, Reelfoot Lake is a navigable stream in the legal, technical sense of the term; for, unless it is navigable in that sense, the soil under the water was subject to grant under the general land laws of the State, and the title, with the right of fisheries, etc., would vest in the riparian owners or other proprietors.

As already stated, Reelfoot Lake, to be navigable in the legal, technical sense, must be capable, in the ordinary stage of the water, of being navigated by such vessels as are usually employed for purposes of commerce, whether foreign or inland, and whether steam or sail vessels. Photographs of different views of the lake accompany the record, which we regret cannot be incorporated in this opinion, since they give a very accurate representation of the obstructions to navigation which abound in this lake, as shown by the record. Many of these views impress us in the same manner as several witnesses were impressed by their first sight of the lake.

One says, "When I first saw the lake, it just reminded me of the masts of a ship in-going into harbor,—the dead trees standing up there." Another states: "The first time I ever saw it, it looked like a great deadening, covered with timber, and overflowed with water." An-

other witness testifies: "The lake has large trees in it, making it look like standing water among timber." Still another states that "the lake is full of trees, snags, stumps, and logs in the deepest water, and in the more shallow is covered with moss and water lilies, with the exception of a few basins, which I do not think connect." Another says: "The general appearance is ugly, unsightly, and rugged. The water part is covered with dead cypress trees, snags, and stumps of very irregular height, size, and shape, besides logs—black walnut, gum, oak, and willow—peeping up above and under the surface of the water."

Another witness states that: "There are stumps, trees, and logs in the lake from one end to the other. Some places they are very thick, and in others not so thick. There are dead trees standing in the water, some high and some low, some large and some small. They range from one foot to six feet high, and the trees from twenty to forty feet high, and the snags about the same. In the bottom of the lake there are many logs and limbs, some places thick and some places thin. You cannot cross from the west to the east side without going by the south end of Green Island. A loaded skiff going from west side of the lake at White's Landing to Samberg would have to pass around south end of Green Island, and also south end of Willow Bar."

Complainants introduced expert testimony to show that said lake is navigable, but the result of this testimony is that, so far as the volume of water is concerned,

there is sufficient for any kind of navigation, but that it will be necessary to remove the trees, logs, stumps, snags, and other impediments. They think this practicable, since such obstructions were removed from the float road built by the Keystone Milling Company. It is also suggested that in all navigable streams there are obstructions, and that dredgeboats and snagboats are constantly engaged in removing such impediments to navigation, and that large appropriations are made by congress and some of the State legislatures for this purpose.

We have examined with much care the evidence submitted by each side on the subject of the navigability of this lake. A review of the testimony in the record has convinced us that Reelfoot Lake, on account of the natural obstructions that everywhere abound over and under its water, in the way of trees, stumps, logs, snags, etc., and for want of proper channels, is not a navigable body of water in a legal sense.

It is practically conceded by the chancellor that the lake in its present condition is not navigable in a legal sense. On this point he stated, viz.: "I think it is not to be held that because navigation of such waters would be attended with difficulty and danger, or even is made wholly impracticable on account of such obstructions, that, therefore, such waters become on that account non-navigable waters, if there is in fact sufficient volume of water for useful navigation, and it can be made available

to the public by a reasonable expenditure in cleaning out the obstructions."

Again, he says: "I do not find any authority holding, if navigation is impracticable on account of such obstructions as logs, timbers, and the like, that such waters are not to be regarded as navigable; but if the navigation is impracticable on account of the natural condition of the river bed,—as where it is full of rocks, or other substances, composing the bed of the river, so that it cannot be navigated without making a channel, —then in such cases it would not be navigable in a legal sense. But," continues the court, "it is a matter of common knowledge that obstructions such as snags, logs, drifts, fallen logs, and recently formed sand bars have to be, and constantly are, removed from the beds of nearly or quite all of the navigable rivers of the country."

Again, in concluding his opinion, the court says, viz.: "I have felt no doubt as to the capacity and volume of water in the lake to carry useful boats, such as are often used in carrying freight and passengers on the smaller navigable rivers. The fact which seems to make the question more difficult of solution than it would otherwise be is the obstruction by trees, stumps, and logs now in the water of the lake. If, under the law, the court must find that the water, to be navigable in its natural stage, must be capable of navigation with all the obstructions in it which have filled it up as the result of years of accumulation, then there would be ground for

serious debate in this case; but I think the rule should be as I have indicated above on this point."

If, as stated by the chancellor, the obstructions to navigation in this lake were of such a character as that they could be removed by a reasonable expenditure of money, there would be much plausibility in the reasoning of the court. But we agree with counsel for defendant "that to undertake to clean or clear out the trees, stumps, snags, logs, and other obstructions in the way of navigation in this lake; to straighten, widen, and make deeper its channels; to prepare landings for the boats, and do all other necessary work in it, in order to make it navigable,—would take an immense amount of money; more than any individual or association of individuals, could or would command for such purposes; more than the State of Tennessee could afford or would expend. None but the federal government is capable of undertaking such a vast enterprise. Lying wholly within this State, and having no navigable connections outside of this State, congress would have no jurisdiction or authority to undertake it or to authorize it. Then the making of this lake navigable by artificial means is out of the question." Moreover, the crucial question is whether the lake is now navigable in a legal sense; not whether it is possible to be made so by artificial means, and a vast expenditure of money, at some remote period of the future.

In the case of *Gaston* v. *Mace* (W. Va.), 10 S. E., 60, 5 L. R. A., 396-399, 25 Am. St. Rep., 848, the doctrine

of the 2 Swan case is quoted approvingly, and this language used in reference to water courses navigable in the common acceptation of the term: "It will be observed from its definition that whether a fresh-water stream be or be not navigable is a question of fact, and, as such, those who claim such nontidal streams to be navigable, have on them the burden of proving that such streams are in fact navigable for boats or lighters, and susceptible for valuable use for commercial purposes, in the natural state, unaided by artificial means or devices."

Again, on page 399, 5 L. R. A., page 65, 10 S. E., 25 Am. St. Rep., 848, the learned judge says: "The true test, therefore, to be applied in such cases, is whether a stream is inherently in its nature capable of being used for the purpose of commerce," etc. In determining the natural capacity of a body of water for navigable purposes, whether navigable in law or in the ordinary sense, the extent to which it is used for purposes of navigation should be looked to, and this affords the strongest evidence as to its navigability or nonnavigability in either sense. *Olive* v. *State* (Ala.), 5 South., 653, 4 L. R. A., 38-41; Gould, Waters, section 43. There must be some commerce and navigation upon it which is essentially valuable. *Swanson* v. *Boom Co.* (Minn.), 44 N. W., 986, 7 L. R. A., 674. Its connection, or want of connection, with other navigable bodies of water is a strong circumstance to be looked to in order to determine the navigability or nonnavigability of a body of water.

Gould, Waters, sections 82a, 83; *Club* v. *Wade* (Wis.), 76 N. W., 273, 42 L. R. A., 305-330. That cannot be considered a navigable river the natural obstructions of which prevent the passage of boats of any description. *Cates* v. *Wadlington*, 10 Am. Dec., 699.

The navigability of a water course does not depend upon its susceptibility of being improved by high engineering skill so as to be navigable, but upon its natural capacity and character, rather than the condition of its channel after it is cleaned out, deepened, or widened. *U. S.* v. *Rio Grande Dam* & *Irrigation Co.* (N. M.), 51 Pac., 674. "A distinction is taken between obstructions that nature has placed in the water courses and those which have been put there by other agencies. If the obstructions are naturally there, and have been there all the time, and they render it unfit for use as a public highway, then it is not a navigable stream, though man, by his skill and means, may remove them, and make it fit for navigation. If the obstructions have been placed in the stream by other agencies than nature then they may be removed so as to make it navigable."

The following summary of the facts on this subject we quote with approval from the brief of counsel for defendant, viz.: "Is Reelfoot Lake now, or was it ever in its natural state or condition, unaided by artificial means or the help of man, inherently capable of being navigated by steamboats or such large flatboats as are ordinarily used on the large rivers and lakes? Could steamboats in size like seagoing vessels navigate Reel-

foot Lake? In its natural state or condition it is and has always been full of trees and logs, planted there by nature. It has no current; is shallow in its ordinary stage of water; has no banks, and only a very doubtful channel, whose depth and width are equally as doubtful and uncertain, and which channel is from 100 feet to a half mile from the water's edge; no outlet or inlet; no water connection with other navigable water courses; with no way by which to get such boats in or out of it; with stumps, and in places trees, in the channels; and grass, lilies, and yoncopins growing in all the shallow places; with no connection between the deep basins, which are all surrounded by stumps and trees put there by nature; the lake filling up year to year; logs lying all over it and in it; snags sticking up everywhere, and many of them hidden beneath the water; with the admitted fact that a steamboat with any tonnage was never on it, and only one steam tug, and two or three light, small flatboats; with the fact that it has never been used for navigation purposes with anything except skiffs, canoes, dugouts, and batteaux. Now, with these conditions existing, most of which are natural, can it be said or argued that the lake is suited or fitted for navigation with such boats as are described by Judge McKinney, or with boats of like size and tonnage? It does seem evident that this lake is not navigable in law, and can never be."

But while this is true, it is as equally clear from the

Webster v. Harris.

evidence that this lake is suitable and of sufficient depth naturally for valuable floatage, as for rafts, flatboats, and perhaps small vessels of lighter draught than ordinary, and in this view the lake is navigable in the common acceptation of the term. It must follow from this view of the case that the land covered by the water was subject to grant, and the title to the lake is not in the State for the use of the public but in the several grantees and riparian owners; while, as already seen from the authorities, the public still has an easement in such a body of water for commercial intercourse and transportation.

We will next inquire as to the title of complainants who are riparian owners in this lake, and especially whether their titles are limited to low-water mark, or extend *"usque ad medium filum aquae,"* and what rights are incident to their titles as riparian owners. Complainants deraign their titles by connected mesne conveyances to two grants issued by the State of North Carolina July 10, 1788, to George Doherty, viz., grant No. 51, for 4,000 acres, and grant No. 35, for 3,000 acres. Complainants Webster and Shaw show that the lands claimed by them are within the bounds of grant No. 35, while the lands of complainants Wade and Moore are embraced within the bounds of grant No. 51.

It is shown in proof that its northwest corner, as well as a large portion of grant No. 51 are in the lake, while the whole of grant 35, excepting 375 acres, is also in the lake. Complainants also introduce in evidence grant No. 98, for 3,000 acres, and grant No. 161, for 2,000

acres, issued by the State of North Carolina to George Doherty, July 10, 1788. It is shown by the proof that grant No. 161 lies entirely under the waters of said lake, and that more than one-half of grant 98 is likewise under the waters of the lake. While complainants do not claim under the last two grants, they are introduced for the purpose of showing an outstanding title in third parties to certain lands claimed by defendant Harris. Exceptions were taken in the court below to the introduction of any of the Doherty grants for want of proper certification, and because improperly issued, and because all claims under them have long since been abandoned. The chancellor overruled all of these exceptions, and, without stopping to review his action at this point, it suffices to say that we find no error in his ruling. It will be remembered that these grants were issued by the State of North Carolina in 1788, while the lands were not submerged by water until 1811, when Reelfoot Lake was formed by a series of earthquakes occurring in that year. The chancellor correctly found that the entire 2,000 acres held under grant 161, and the greater part of the 3,000 acres held under grant 98, and several hundred of the 4,000 acres held under grant 51, and nearly all of the 3,000 acres held under grant 35 are under the waters of the lake.

It is shown that as to grant No. 35 the defendant Harris claims title under a deed made by J. G. Smith, executor of H. H. Crockett, to Wells and Cochran, and that so much of grant No. 51 as is under the lake the defend-

ant Harris also claims under a deed made to him since this suit was begun, June 21, 1900, by J. G. Smith as executor of H. H. Crockett. We agree with the chancellor that complainants Webster, Shaw, Wade, and Moore have deraigned title to these lands by mesne connected conveyances to the Doherty grants issued by the State of North Carolina, and, in addition, have shown actual adverse possession to the granted lands for more than 20 years. It is thus shown that they have established an indefeasible title to the lands embraced within their deeds and possession. Hence it is clear that these particular lands cannot be the property of the defendant Harris, as claimed by him in his cross bill.

Two other grants introduced by complainants must be mentioned: First, grant No. 4,436, dated December, 1839, issued by the State of Tennessee to Charles Nix for 70 acres lying just north of grant No. 51, and abutting on the lake. This grant calls for a tree on the bank of the lake, running thence to another tree on the bank of the lake at Tanner's northwest corner. The Tanner grant, No. 4,404, is also introduced, embracing 102 acres, dated December, 1839, and calling for the Nix grant at its northwest corner. It appears that the land covered by complainant Mitchell's deed also includes the Nix grant. Complainants also introduce in evidence a deed from K. Raynor and wife and Jas. Robertson and Jno. Crockett dated November 1, 1851, covering grant No. 51, to Geo. Doherty, calling for a stake in the lake at its northwest corner. A deed from K. Raynor and

wife to Crockett, dated February, 1872, and embracing
the same land, was also introduced; also a deed from
Jas. Robertson to Crockett, dated August, 1854, and
conveying all the former's interest in said tract grant
No. 51.

While no conveyance from Geo. Doherty appears in
evidence, yet complainants deraign title by connected
conveyances from Robertson and Crockett, and show
actual adverse possession of these lands with inclosures
for more than seven years under such assurances of title
as establish their titles under the statute of limitations,
as found by the chancellor. Complainants Ward, Deal,
Mitchell, and Powell also establish their titles by the
same deraignment and character of possession. It fur-
ther appears that all the deeds and muniments of title
under which the complainants claim call for the lake at
low-water mark as the western boundry of their several
tracts. The law of this State is that, if the stream is
legally and technically navigable, the soil under the
water and the use of the stream belong to the public.
*Goodwin* v. *Thompson,* 15 Lea, 209, 54 Am. Rep., 410.
If, however, the stream be only navigable in the ordinary
sense, the soil under the water belongs to the riparian
owner, but the public has an easement in the stream for
the purposes of transportation and commerce. *Holbert*
v. *Edens,* 5 Lea, 207, 40 Am. Rep., 26. If such stream
be the boundary of lands, the title extends to the thread
or center of the stream of common right or by construc-
tion of law. Id. This is true unless there is an inten-

tion clearly expressed in the deed or grant excluding the intermediate space between the edges or bank of the stream and its thread. 3 Washb. Real Prop., p. 436; *Martin* v. *Nance,* 3 Head, 650; *Holbert* v. *Edens,* 5 Lea, 204, 40 Am. Rep., 26; *Posey* v. *James,* 7 Lea, 99. We find such intention expressed in the deeds of complainants. Their titles do not extend to the middle or thread of the lake for the reason their deeds expressly call for the water's edge at low-water mark as their western boundary, and hence the rule that ordinarily applies to the rights of riparian owners in nonnavigable waters does not apply in this instance.

What, then, are the rights of these riparian owners in the waters of such nonnavigable stream; that is to say, in a stream navigable not in the legal, but only in the ordinary sense? The proof is that complainants have practically adopted this view by inclosing their lands to the water, and some in the water, building their fences in several instances down into the water on the western inclosure of their premises. Riparian proprietors upon both navigable and nonnavigable streams and lakes are entitled to have the water flow or remain in its natural condition undiminished and unpolluted. They have the right to maintain docks, and to have access to the water from their frontage. Gould, Waters, sections 149, 150, 153, 179.

Land formed by alluvium or accretions from the water, and land gained by the gradual recession of the water contiguous to the respective owners, belongs to

the riparian owners. Gould, Waters, section 155. This doctrine is applicable to tide waters as well as to nontidal waters and lakes. Id. p. 313; 12 Am. & Eng. Enc. Law, p. 651. The rights of riparian proprietors are correlative. The right of each is subject to a like right of all others similarly situated. It is indivisible. One has no right to use the water so as to prejudice the rights of another. 28 Am. & Eng. Enc. Law, p. 949 et seq. Each has a right to the free and uninterrupted use of the water for domestic purposes. Id. p. 953. In general, he has the right to supply his material wants from it. Gould, Waters, sections 204, 205, 209, 218; Washb., Easem. (2 Ed.), 316, 318, etc. These rights may be protected by injunction in equity. Pom, Eq. Jur., section 75; Washb. Easem. 748; 3 Kent Comm., p. 439; 28 Am. and Eng. Ency. Law, p. 970, and long list of authorities cited in notes; *Ulbricht* v. *Water Co.* (Ala.), 6 South., 78, 4 L. R. A., 573, 11 Am. St. Rep.; 72 and exhaustive note.

We entirely concur with the conclusions reached by Judge Swiggart on this branch of the case, which are thus expressed in his learned opinion, viz.: "It must therefore follow, from the rules laid down in these authorities, and in others on the subject of the rights of riparian owners on rivers and lakes and other waters, whether navigable or nonnavigable in any sense, that no one, whether he is only a stranger or is himself a riparian owner on the same body of water, has any right to impair or destroy the interest and the use of such riparian owner to such water. In the language of Mr.

Washburn (Easements, 316) : 'The right to enjoy this flow of water without disturbance or interruption by any other proprietor in one *jure naturae,* and is an incident of property in the land, not an appurtenance to it, like the right he has to enjoy the soil itself in its natural state, unaffected by the tortious acts of a neighboring landowner.   It is an indispensable incident to the ownership of land, made by an inflexible rule of law an absolute and fixed right.'   The flow of water cannot be diverted, and turned into a different channel.   It cannot be lowered by drainage or other artificial means from its natural level or height.   It cannot be raised or increased in volume or level by damming or other means. It cannot be polluted or corrupted, and made less fit for use, wrongfully and unnecessarily.   The riparian owner cannot be deprived of any of the many uses he has the right to make of the water, or injuriously affected in that respect."

Defendant Harris, in his cross bill, claims that his title embraces the whole of Reelfoot Lake, its shores or banks, and all of the islands in the lake.   His muniments of title exhibited in proof are:   First, a quitclaim deed, dated December 28, 1898, from the Reelfoot Outing Company, a corporation, of Louisville, Ky.; second, certain grants to himself and other parties from the State of Tennessee; third, connected mesne conveyances from the original grantors to certain grants.   The land claimed by cross-complainant Harris is embraced in the following grants issued by the State of Tennessee:

Grant No. 14,864, to W. H. Caldwell, for 5,000 acres, issued 1854; grant No. 14,653, to W. H. Caldwell, for 5,000 acres, issued 1854; grant No. 14,654, to W. H. Caldwell, for 5,000 acres, issued 1854; grant No. 16,042, to W. H. Caldwell, for 5,000 acres, issued 1860; grant No. 17,191, to Wells et al., for 1,680 acres, issued 1897; grant No. ———, to Wells et al., for 2,250 acres, issued 1897; grant No. 17,190, to Wells et al., for 4,745 acres, issued 1897; grant No. 17,084, to Gates et al., for 3,701 acres, issued 1895; grant No. 17,085, to Gates et al., for 4,187 acres, issued 1895; grant No. 17,086, to Gates et al. for 1,768 acres, issued 1895; grant No. 17,087, to J. C. Harris, for 5,562 acres, issued 1895; grant No. 17,088, to Harris et al., for 3,078 acres, issued 1895; grant No. 17,089, to Harris et al., for 3,152 acres, issued 1895; grant No. 35, to Geo. Doherty (portion), 2,605 acres, issued by N. C. 1788.

The defendant Harris does not claim to own all the land embraced in the Caldwell grants. It is also true that the grants to Harris et al. and to Gates et al. embrace land that is covered by the Caldwell grants. It is also true that since the bill was filed defendant Harris has purchased certain other tracts, which are covered by the waters of Reelfoot Lake. It appears the Doherty grant, No. 35, issued by the State of North Carolina in 1788, is also the grant under which the complainants Webster and Shaw deraign title to 395 acres. It appears that all the mesne conveyances from those grants to defendant Harris are deeds with special warranty

against parties claiming by or through the grantors themselves, and in the nature of quitclaims. The record fails to show any proof locating the lands embraced in these several grants with reference to Reelfoot Lake, except grant No. 35, for 2,065 acres. There is no proof of any survey of the different tracts of land, but there is a map introduced, in which the surveyor undertook to plot the several tracts of land in the lake. Cross-complainant Harris is bound to show with accuracy the particular lands he claims, in order to support ejectment.

We entirely concur with the finding of the chancellor on this point, who stated as follows in his written opinion: "No effort is made to plot these various tracts, and to show what exact land or lands any one of the grants or entries embraces or covers. No surveyor is introduced who actually located and established the corners and lines of these tracts. It would be impossible for the court in this case to locate any of these grants with reference to any particular spot or object on Reelfoot Lake. The only location or attempt is by general questions to the surveyor Howard and to W. M. Wilson, one of whom (Howard) says he thinks they cover all the lake and a great deal more, and the other (Wilson) says they do not include all the lake."

Our conclusions, then, briefly summarized, are as follows: First. That Reelfoot Lake is not navigable in the legal, technical sense, but is navigable in the ordinary and common acceptation of the term. Second. That the lands under the waters of said lake were sub-

ject to grant by the State.    Third.    That complainants
have established title to the lands claimed by them, but
their lines only extend to low-water mark on said lake.
Fourth.      That complainants· are riparian owners and
entitled to all the rights incident to such proprietor-
ship.    Fifth.  That defendant Harris has failed to locate
by proof the lands claimed by him under the waters of
said lake, and his cross bill is therefore dismissed.
Sixth. That complainants, as riparian owners on said
lake, are entitled to have the defendant Harris re-
strained by injunction from any efforts to drain the
waters of said lake, and to that end .the injunction
granted by the chancellor is made perpetual.