# UNITED STATES v. CRESS.

# UNITED STATES v. KELLY ET AL.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF KENTUCKY.

Nos. 84, 718. Argued December 13, 1916.—Decided March 12, 1917.

The servitude to the interests of navigation of privately owned lands
forming the banks and bed of a stream is a natural servitude, con-
fined to such streams as in their ordinary and natural condition are
susceptible of valuable public use in navigation, and confined to the
natural condition of such streams.

When navigable streams affording ways of commerce between States
are improved by the federal government by means of locks and dams
which raise the water above its natural level, the streams as thus im-
proved remain navigable waters of the United States for all purposes
of federal jurisdiction and regulation.

The power of the federal government to improve navigable streams in
the interest of interstate and foreign commerce must be exercised,
when private property is taken, in subordination to the Fifth Amend-
ment.

In improving the navigation of the Cumberland River, in Kentucky,
under the commerce power, the federal government by means of a
lock and dam raised the water above the natural level so that lands
on a non-navigable tributary, not normally invaded thereby, were
subjected permanently to periodical overflows substantially injuring,
though not destroying, their value. *Held*, in an action for damages
under § 24 of the Judicial Code (derived from the Tucker Act):

(1) That this amounted to a partial taking of the property.

(2) That the United States was liable *ex contractu* to compensate the
owner to the extent of the injury.

(3) That, upon payment, the United States would acquire an ease-
ment to overflow the land as often as would necessarily result from the
use of the lock and dam for navigation, the fee, however, remaining
in the private owner.

(4) That the riparian owner also was entitled to compensation for im-
pairment of the value of his land caused by the destruction of a

ford over the tributary used in connection with a private way appurtenant to the land.

A like improvement of the Kentucky River, in Kentucky, by raising its water above natural level raised in like manner the water in a non-navigable tributary on which were a privately owned mill and mill-site, thus ending the usefulness of the mill by doing away with the head of water necessary to run it. *Held,* that the mill-owner, to whom also, under the law of Kentucky, belonged the bed of the tributary with the right to have the water flow there free from artificial obstruction, was entitled *ex contractu* to recover from the United States an amount equal to the depreciation of the mill property resulting from the loss of water-power.

The right to have the water of a non-navigable stream flow away from riparian land without artificial obstruction is not a mere easement or appurtenance, but exists by the law of nature as an inseparable part of the land itself.

Section 152 of the Judicial Code, permitting costs against the United States in claims cases, although appearing in the chapter entitled "The Court of Claims," is not confined to cases in that court but applies also when the District Court is exercising concurrent jurisdiction under § 24. This conclusion results from a consideration of the Tucker Act, of March 3, 1887, c. 359, 24 Stat. 505, and §§ 294 and 295 of the Code, read in connection with the repealing section, 297.

THE cases are stated in the opinion.

*Mr. Assistant Attorney General Thompson,* with whom *Mr. P. M. Cox* and *Mr. Seth Shepard, Jr.,* were on the briefs, for the United States.

*Mr. J. F. Winn* for defendants in error in No. 718.

No appearance for defendant in error in No. 84.

MR. JUSTICE PITNEY delivered the opinion of the court.

These cases were argued together, involve similar questions, and may be disposed of in a single opinion. They were actions brought in the District Court by the respective defendants in error against the United States under

the 20th paragraph of § 24, Jud. Code (Act of March 3, 1911, c. 231, 36 Stat. 1087, 1093), to recover compensation for the taking of lands and water rights by means of backwater resulting from the construction and maintenance by the Government of certain locks and dams upon the Cumberland and Kentucky Rivers, respectively, in the State of Kentucky, in aid of the navigation upon those rivers.

In No. 84 the findings of the District Court are, in substance, that at the time of the erection of Lock and Dam No. 21 in the Cumberland River, the plaintiff was the owner of 189 acres of land on Whiteoak Creek, a tributary of the Cumberland, not far distant from the river; that by reason of the erection of the lock and dam six and six-tenths acres of this land are subject to frequent overflows of water from the river, so as to depreciate it one-half of its value, and a ford across Whiteoak Creek and a part of a pass-way are destroyed; that the six and six-tenths acres were worth $990, and the damage thereto was $495; that the damage to the land by the destruction of the ford was $500; and that plaintiff was entitled to recover the sum of $995. It may be supposed that Whiteoak Creek was not a navigable stream, but there is no finding on the subject.

In No. 718 the findings are to the effect that at the time of the erection by the Government of Lock and Dam No. 12 in the Kentucky River the plaintiffs, together with another person who was joined as a defendant, were the owners and in possession of a tract of land situate on Miller's Creek, a branch of the Kentucky, containing five and one-half acres, upon which there were a mill and a mill seat; that by reason of the erection of the lock and dam the mill no longer can be driven by water power; that the water above the lock and dam, when it is at pool stage, is about one foot below the crest of the mill dam, and this prevents the drop in the current that is necessary to run

the mill; that no part of the land or mill is overflowed or covered by pool stage of water, nor is the mill physically damaged thereby; that Miller's Creek is not a navigable stream; that the damages sustained by the owners of the mill, representing depreciation of the value of the mill property by cutting off the water power, amount to $1500.

Judgments were entered in favor of the respective land owners for the sums mentioned in the findings, together with interest and the costs of the suits, and the United States appealed to this court.

(1.) A fundamental contention made in behalf of the Government, and one that applies to both cases, is that the control by Congress, and the Secretary of War acting for it, over the navigation of the Cumberland and Kentucky Rivers, must also include control of their tributaries, and that in order to improve navigation at the places mentioned in the findings it was necessary to erect dams and back up the water, and the right to do this must include also the right to raise the water in the tributary streams.

In passing upon this contention we may assume, without however deciding, that the rights of defendants in error are no greater than if they had been riparian owners upon the rivers, instead of upon the tributary creeks.

The States have authority to establish for themselves such rules of property as they may deem expedient with respect to the streams of water within their borders both navigable and non-navigable, and the ownership of the lands forming their beds and banks (*Barney* v. *Keokuk,* 94 U. S. 324, 338; *Packer* v. *Bird,* 137 U. S. 661, 671; *Hardin* v. *Jordan,* 140 U. S. 371, 382; *Shively* v. *Bowlby,* 152 U. S. 1, 40, 58; *St. Anthony Falls Water Power Co.* v. *St. Paul Water Commissioners,* 168 U. S. 349, 358), subject, however, in the case of navigable streams, to the paramount authority of Congress to control the navigation so far as may be necessary for the regulation of commerce

among the States and with foreign nations (*Shively* v. *Bowlby*, 152 U. S. 1, 40; *Gibson* v. *United States*, 166 U. S. 269, 272; *Scott* v. *Lattig*, 227 U. S. 229, 243); the exercise of this authority being subject, in its turn, to the inhibition of the Fifth Amendment against the taking of private property for public use without just compensation (*Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 336; *United States* v. *Lynah*, 188 U. S. 445, 465, 471).

The State of Kentucky, like most of the States of the Union, determines the navigability of her streams, so far as the public right is concerned, not by the common-law test of the ebb and flow of the tide—manifestly inapplicable in a State so wholly remote from the sea—but by the test of navigability in fact (*Thurman* v. *Morrison*, 53 Kentucky, [14 B. Mon.] 367 [2d ed. p. 296]; *Morrison* v. *Thurman*, 56 Kentucky, [17 B. Mon.] 249; *Goodin's Executors* v. *Kentucky Lumber Co.*, 90 Kentucky, 625; *Murray* v. *Preston*, 106 Kentucky, 561, 564; *Banks* v. *Frazier*, 111 Kentucky, 909, 912; *Ireland* v. *Bowman & Cockrell*, 130 Kentucky, 153, 161), while sustaining private ownership of the beds of her streams, both navigable and non-navigable, according to the common-law rule (*Berry* v. *Snyder*, 66 Kentucky, [3 Bush] 266, 273, 277; *Miller* v. *Hepburn*, 71 Kentucky, [8 Bush] 326, 331; *Williamsburg Boom Co.* v. *Smith*, 84 Kentucky, 372, 374; *Wilson* v. *Watson*, 141 Kentucky, 324, 327; *Robinson* v. *Wells*, 142 Kentucky, 800, 804), with incidental rights to the flow of the stream in its natural state (*Anderson* v. *Cincinnati Southern Railway*, 86 Kentucky, 44, 48).

The general rule that private ownership of property in the beds and waters of navigable streams is subject to the exercise of the public right of navigation, and the governmental control and regulation necessary to give effect to that right, is so fully established, and is so amply illustrated by recent decisions of this court, that a mere reference to the cases will suffice. *Scranton* v. *Wheeler*,

179 U. S. 141, 163; *Philadelphia Company* v. *Stimson,* 223 U. S. 605, 634; *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U. S. 53, 62; *Lewis Blue Point Oyster Co.* v. *Briggs,* 229 U. S. 82, 85, 88; *Greenleaf Johnson Lumber Co.* v. *Garrison,* 237 U. S. 251, 268; *Willink* v. *United States,* 240 U. S. 572, 580.

But this rule, like every other, has its limits, and in the present cases, which require us to ascertain the dividing line between public and private right, it is important to inquire what are "navigable streams" within the meaning of the rule.

In Kentucky, and in other States that have rejected the common-law test of tidal flow and adopted the test of navigability in fact, while recognizing private ownership of the beds of navigable streams, numerous cases have arisen where it has been necessary to draw the line between public and private right in waters alleged to be navigable; and by an unbroken current of authorities it has become well established that the test of navigability in fact is to be applied to the stream in its natural condition, not as artificially raised by dams or similar structures; that the public right is to be measured by the capacity of the stream for valuable public use in its natural condition; that riparian owners have a right to the enjoyment of the natural flow without burden or hindrance imposed by artificial means, and no public easement beyond the natural one can arise without grant or dedication save by condemnation with appropriate compensation for the private right. Cases exemplifying these propositions are cited in a marginal note.[1] We have found no case to the

---

[1] *Wadsworth* v. *Smith,* 11 Me. 278, 281; *Brown* v. *Chadbourne,* 31 Me. 9, 21; *Treat* v. *Lord,* 42 Me. 552, 561–2; *Pearson* v. *Rolfe,* 76 Me. 380, 385; *Moore* v. *Sanborne,* 2 Mich. 519, 523–4; *Thunder Bay River Booming Co.* v. *Speechly,* 31 Mich. 336, 343, 345; *Witheral* v. *Muskegon Booming Co.,* 68 Mich. 48, 58–9; *Improvement Co.* v. *Lumber Co.,* 69 Mich. 207, 212, 213; *Koopman* v. *Blodgett,* 70 Mich. 610, 616; *Goodin's Ex'rs*

contrary. An apparent but not a real exception is the New York case of *Canal Appraisers* v. *People ex rel. Tibbits* (1836), 17 Wend. 571, where the decision was rested (pp. 609, 612, 624) upon the ground that the bed of the Mohawk River was the property of the State; the authority of the case having been limited accordingly by later decisions of the court of last resort of that State. *Commissioners of Canal Fund* v. *Kempshall*, 26 Wend. 404, 416; *Child* v. *Starr*, 4 Hill, 369, 372; *Fort Plain Bridge Co.* v. *Smith*, 30 N. Y. 44, 63; *Smith* v. *City of Rochester*, 92 N. Y. 463, 482; *Fulton L. H. & P. Co.* v. *State*, 200 N. Y. 400, 413.

Many state courts, including the Court of Appeals of Kentucky, have held, also, that the legislature cannot, by simple declaration that a stream shall be a public highway, if in fact it be not navigable in its natural state, appropriate to public use the private rights therein without compensation. *Morgan* v. *King*, 18 Barb. 277, 284; 35 N. Y. 454, 459, 461; *Chenango Bridge Co.* v. *Paige*, 83 N. Y. 178, 185; *Murray* v. *Preston*, 106 Kentucky, 561, 563; *Stuart* v. *Clark's Lessee*, 32 Tennessee, (2 Swan) 9, 17; *Walker & Fulton* v. *Board of Public Works*, 16 Ohio, 540, 544; *Olive* v. *State*, 86 Alabama, 88, 92; *People* v. *Elk River M. & L. Co.*, 107 California, 221, 224. And see *Thunder Bay River Booming Co.* v. *Speechly*, 31 Michigan, 336, 345; *Koopman* v. *Blodgett*, 70 Michigan, 610, 616.

This court has followed the same line of distinction.

v. *Kentucky Lumber Co.*, 90 Ky. 625, 627; *Murray* v. *Preston*, 106 Ky. 561, 565; *Banks* v. *Frazier*, 111 Ky. 909, 912; *Morgan* v. *King*, 35 N. Y. 454, 459; *Chenango Bridge Co.* v. *Paige*, 83 N. Y. 178, 185; *Ten Eyck* v. *Town of Warwick*, 82 N. Y. Sup. Ct. (75 Hun) 562, 566; *Weise* v. *Smith*, 3 Ore. 445, 449; *Goodwill* v. *Police Jury*, 38 La. Ann. 752, 755; *Smith & Hambrick* v. *Fonda*, 64 Miss. 551, 554; *East Hoquiam Boom Co.* v. *Neeson*, 20 Wash. 142, 146; *Stuart* v. *Clark's Lessee*, 32 Tenn. (2 Swan) 9, 16; *Irwin* v. *Brown*, 3 Tenn. Cas. 309; *Webster* v. *Harris*, 111 Tenn. 668, 677; *Little Rock, Mississippi River & Texas R. R. Co.* v. *Brooks*, 39 Ark. 403, 409.

That the test of navigability in fact should be applied to streams in their natural condition was in effect held in *The Daniel Ball*, 10 Wall. 557, a case which turned upon the question whether Grand River, in the State of Michigan, was one of the "navigable waters of the United States" within the meaning of acts of Congress that regulated vessels carrying merchandise and passengers upon such waters. Mr. Justice Field, speaking for the court, after showing that the tidal test was not applicable in this country, said (p. 563): "A different test must, therefore, be applied to determine the navigability of our rivers, and that is found in their navigable capacity. Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, *in their ordinary condition*, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." The point was set forth more clearly in *The Montello*, 20 Wall. 430, where the question was whether Fox River, in the State of Wisconsin, was a navigable water of the United States within the meaning of the acts of Congress. There were rapids and falls in the river, but the obstructions caused by them had been removed by artificial means so as to furnish uninterrupted water communication for steam vessels of considerable capacity. It was argued (p. 440) that although the river might now be considered a highway for commerce conducted in the ordinary modes, it was not so in its natural state, and therefore was not navigable water of the United States within the purview of *The Daniel Ball* decision. The court, accepting navigability in the natural state of the river as the proper test, proceeded to show that, even before the improvements resulting in an unbroken navigation were undertaken, a large and successful interstate commerce had been carried on through this river by means of Durham boats,

which were vessels from 70 to 100 feet in length, with 12 feet beam, and drawing when loaded from 2 to 2½ feet of water. The court, by Mr. Justice Davis, declared (p. 441) that it would be a narrow rule to hold that, in this country, unless a river was capable of being navigated by steam or sail vessels it could not be treated as a public highway. "The capability of use by the public for purposes of transportation and commerce affords the true criterion of the navigability of a river, rather than the extent and manner of that use. If it be capable *in its natural state* of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact, and becomes in law a public river or highway." And again (p. 443): "There are but few of our fresh-water rivers which did not originally present serious obstructions to an uninterrupted navigation. In some cases, like the Fox River, they may be so great while they last as to prevent the use of the best instrumentalities for carrying on commerce, but *the vital and essential point is whether the natural navigation of the river* is such that it affords a channel for useful commerce. If this be so the river is navigable in fact, although its navigation may be encompassed with difficulties by reason of natural barriers, such as rapids and sand-bars." Numerous decisions of state courts were cited as supporting this view, including some of those to which we have referred.

*Pumpelly* v. *Green Bay Company*, 13 Wall. 166, involved the right to compensation for land overflowed with back-water from a dam erected and maintained in the Fox River, under authority of the State of Wisconsin, for the improvement of navigation. (A permissible exercise of state power, in the absence of action by Congress, although it was an interstate navigable water; *Willson* v. *Black-Bird Creek Marsh Co.*, 2 Pet. 245, 251; *Gilman* v. *Philadelphia*, 3 Wall. 713.) The raising of the river above

its natural stage, by means of an artificial structure, was the *gravamen* of the complaint. It was argued (p. 174) that the State might, in the interest of the public, "erect such works as may be deemed expedient for the purpose of improving the navigation and increasing usefulness of a navigable river, without rendering itself liable to individuals owning land bordering on such river, for injuries to their lands resulting from their overflow by reason of such improvements." This court overruled the contention, and held there was a taking without compensation contrary to the applicable provision of the constitution of Wisconsin.

In *United States* v. *Lynah*, 188 U. S. 445, the same principle was applied in the case of an operation by the Government of the United States. For the improvement of the navigation of the Savannah River certain dams and other obstructions were placed and maintained in its bed, with the result of raising the water above its natural height and backing it up against plaintiffs' embankment upon the river and interfering with the drainage of their plantation. This was held (pp. 465, 471) to be a taking of private property, requiring compensation under the Fifth Amendment, notwithstanding the work was done by the Government in improving the navigation of a navigable river. The raising of the water above its natural level was held to be an invasion of the private property thereby flowed.

In several other cases, the limitation of the public right to the natural state of the stream has been recognized. *Packer* v. *Bird*, 137 U. S. 661, 667; *United States* v. *Rio Grande Dam & Irrigation Co.*, 174 U. S. 690, 698; *Leovy* v. *United States*, 177 U. S. 621, 631.

It follows from what we have said that the servitude of privately-owned lands forming the banks and bed of a stream to the interests of navigation is a natural servitude, confined to such streams as in their ordinary and natural

condition are navigable in fact, and confined to the natural condition of the stream. And, assuming that riparian. owners upon non-navigable tributaries of navigable streams are subject to such inconveniences as may arise from the exercise of the common right of navigation, this in like manner must be limited to the natural right. The findings make it clear that the dams in question, constructed by the Government in the Cumberland and Kentucky Rivers, respectively, are for raising the level of those streams along certain stretches by means of backwater, so as to render them, to the extent of the raising, artificial canals instead of natural waterways. In the language of engineering, the Government has "canalized" the rivers. We intimate no doubt of the power of the United States to carry out this kind of improvement. Nor do we doubt that, upon the completion of the improvements, these rivers: the Cumberland because it is an avenue of communication between two States; the Kentucky and also the Cumberland because in connection with the Ohio and Mississippi Rivers they furnish highways of commerce among many States (*Gilman* v. *Philadelphia,* 3 Wall. 713, 725; *The Daniel Ball,* 10 Wall. 557, 563; *South Carolina* v. *Georgia,* 93 U. S. 4, 10); remained navigable waters of the United States for all purposes of federal jurisdiction and regulation, notwithstanding the artificial character of the improvements. *Ex parte Boyer,* 109 U. S. 629, 632; *The Robert W. Parsons,* 191 U. S. 17, 28.

But the authority to make such improvements is only a branch of the power to regulate interstate and foreign commerce, and, as already stated, this power, like others, must be exercised, when private property is taken, in subordination to the Fifth Amendment. *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 336; *United States* v. *Lynah,* 188 U. S. 445, 465, 471. And we deem it clear that so much of the properties of the respective

defendants in error as was unaffected by the flow of the rivers or their tributaries prior to the construction of the locks and dams in question was private property, and not subject to be overflowed, without compensation, in the raising of the level of the rivers by means of artificial dams.

These cases have no proper relation to cases such as *Gibson* v. *United States*, 166 U. S. 269, where no water was thrown back on claimant's land, and the damage was confined to an interference with the access thence to the navigable portion of the river; *Scranton* v. *Wheeler*, 179 U. S. 141, 153, which likewise had to do with the interruption of access from riparian land to a navigable channel; *Bedford* v. *United States*, 192 U. S. 217, 225, where the damage to claimant's land resulted from operations conducted by the Government six miles farther up the river; *Jackson* v. *United States*, 230 U. S. 1, 23, where owners of lands on the east bank of the Mississippi claimed compensation as for a taking of their property by reason of the effect of levees built on the west bank opposite their lands as a part of a system of levees designed to prevent crevasses, retain the water in the river, and thus improve the navigation. In each of these, there was no direct invasion of the lands of the claimants, the damages were altogether consequential, and the right to compensation was denied on that ground.

(2.) It is contended, in No. 84, that the damage to Cress' land by the overflow of six and six-tenths acres, because it depreciated its value only to the extent of one-half, does not measure up to a taking, but is only a "partial injury," for which the Government is not liable. The findings, however, render it plain that this is not a case of temporary flooding or of consequential injury, but a permanent condition, resulting from the erection of the lock and dam, by which the land is "subject to frequent overflows of water from the river." That overflowing

lands by permanent back-water is a direct invasion, amounting to a taking, is settled by *Pumpelly* v. *Green Bay Co.*, 13 Wall: 166, 177; *United States* v. *Lynah*, 188 U. S. 445, 468–470. It is true that in the *Pumpelly Case* there was an almost complete destruction, and in the *Lynah Case* a complete destruction, of the value of the lands, while in the present case the value is impaired to the extent of only one-half. But it is the character of the invasion, not the amount of damage resulting from it, so long as the damage is substantial, that determines the question whether it is a taking. As the court said, speaking by Mr. Justice Brewer, in *United States* v. *Lynah*, 188 U. S. 445, 470: "Where the government by the construction of a dam or other public works so floods lands belonging to an individual as to substantially destroy their value there is a taking within the scope of the Fifth Amendment. While the government does not directly proceed to appropriate the title, yet it takes away the use and value; when that is done it is of little consequence in whom the fee may be vested. Of course, it results from this that the proceeding must be regarded as an actual appropriation of the land, including the possession, the right of possession and the fee; and when the amount awarded as compensation is paid the title, the fee, with whatever rights may attach thereto—in this case those at least which belong to a riparian proprietor—pass to the government and it becomes henceforth the owner." There is no difference of kind, but only of degree, between a permanent condition of continual overflow by back-water and a permanent liability to intermittent but inevitably recurring overflows; and, on principle, the right to compensation must arise in the one case as in the other. If any substantial enjoyment of the land still remains to the owner, it may be treated as a partial instead of a total divesting of his property in the land. The taking by condemnation of an interest less than the fee is familiar in the law of eminent

domain. Where formal proceedings are initiated by the party condemning, it is usual and proper to specify the precise interest taken, where less than the fee. But where, as in this case, the property-owner resorts to the courts, as he may, to recover compensation for what actually has been taken, upon the principle that the Government by the very act of taking impliedly has promised to make compensation because the dictates of justice and the terms of the Fifth Amendment so require (*United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645, 656; *United States* v. *Lynah*, 188 U. S. 445, 465), and it appears that less than the whole has been taken and is to be paid for, such a right or interest will be deemed to pass as is necessary fairly to effectuate the purpose of the taking; and where, as in this case with respect to the six and six-tenths acres, land is not constantly but only at intervals overflowed, the fee may be permitted to remain in the owner, subject to an easement in the United States to overflow it with water as often as necessarily may result from the operation of the lock and dam for purposes of navigation.

(3.) In No. 84 some question is made about the allowance for the damage to the land by the destruction of the ford across Whiteoak Creek and the pass-way, but we deem the objection unsubstantial. It is said there is nothing to show how Cress acquired ownership of the ford, and that it does not appear that he had a right to pass over the adjoining land of one Brown. It seems to us, however, that the findings, while meager, sufficiently import that Cress had a right to a private way and ford as appurtenant to his land, and that the damage to the land by the destruction of the ford was $500. This brings the case squarely within *United States* v. *Welch*, 217 U. S. 333, 339, and *United States* v. *Grizzard*, 219 U. S. 180, 184, 185.

(4.) In No. 718 there is a contention that, because the back-water is confined to Miller's Creek, it does not

amount to a taking of land. But the findings render it plain that it had the necessary effect of raising the creek below the dam to such an extent as to destroy the power of the mill dam that was essential to the value of the mill; or, as the findings put it, "The water above the lock and dam, when it is at pool stage, is about one foot below the crest of the mill dam, which prevents the drop in the current which is necessary to run the mill." Under the law of Kentucky, ownership of the bed of the creek, subject only to the natural flow of the water, is recognized as fully as ownership of the mill itself. The right to have the water flow away from the mill dam unobstructed, except as in the course of nature, is not a mere easement or appurtenance, but exists by the law of nature as an inseparable part of the land. A destruction of this right is a taking of a part of the land. *Gardner* v. *Village of Newburgh*, 2 Johns. Ch. 162, 166; *Tyler* v. *Wilkinson*, 4 Mason, 397, Fed. Case No. 14,312, 24 Fed. Cas. 472,474; *Johnson* v. *Jordan*, 2 Metc. 234, 239; *Wadsworth* v. *Tillotson*, 15 Connecticut, 366, 373; *Parker* v. *Griswold*, 17 Connecticut, 288, 299; *Harding* v. *Stamford Water Co.*, 41 Connecticut, 87, 92; *Holsman* v. *Boiling Spring Bleaching Co.*, 14 N. J. Eq. 335, 343; *Beach* v. *Sterling Iron & Zinc Co.*, 54 N. J. Eq. 65, 73; *Scriver* v. *Smith*, 100 N. Y. 471, 480; *Crook* v. *Hewitt*, 4 Washington, 749, 754; *Rigney* v. *Tacoma Light & Water Co.*, 9 Washington, 576, 583; *Benton* v. *Johncox*, 17 Washington, 277, 281; *Lux* v. *Haggin*, 69 California, 255, 390; *Hargrave* v. *Cook*, 108 California, 72, 77; *Pine* v. *Mayor, etc., of City of New York*, 103 Fed. Rep. 337, 339; 112 Fed. Rep. 98, 103; *Wood* v. *Waud*, 3 Exch. 748, 775; *Dickinson* v. *Grand Junction Canal Co.*, 7 Exch. 282, 299; *Stokoe* v. *Singers*, 8 El. & Bl. 31, 36 (Erle, J.).

(5.) In both cases it is urged that there was error in allowing costs against the Government. Section 24 (20) of the Judicial Code, under which the suits were brought, originated in the provisions of the so-called Tucker Act

of March 3, 1887, c. 359, 24 Stat. 505, and the argument
of the Government is that while under § 15 of that act
costs were recoverable against the United States, in the
District Court as in the Court of Claims, yet that § 297,
Jud. Code, repealed all of the Tucker Act with the ex-
ception of §§ 4, 5, 6, 7, and. 10, which relate to matters
of procedure, and that there is no longer any authority of
law for allowing costs against the United States in suits·
brought in the District Court. The fact is that § 297,
Jud. Code, besides the clause repealing the Tucker Act
with the exceptions mentioned, contains in its final para-
graph a repeal of "all other Acts and parts of Acts, in so
far as they are embraced within and superseded by this
Act." Now, not only is the provision of § 2 of the Tucker
Act, conferring upon the District Courts concurrent juris-
diction with the Court of Claims over certain claims
against the United States, carried into § 24 (20) of the
Code, but the provision of § 15 of the Tucker Act for the
allowance of costs against the Government is carried in
as § 152. It is true that § 24 (20) is a part of Chapter
2 of the Code, entitled "District Courts—Jurisdiction,"
while § 152 is a part of Chapter· 7, entitled "The Court
of Claims." But by §§ 294 and 295 it is declared and
enacted as follows: "Sec. 294. The provisions of this Act,
so far as they are substantially the same as existing stat-
utes, shall be construed as continuations thereof, and not
as new enactments, and there shall be no implication of a
change of intent by reason of a change of words in such
statute, unless such change of intent shall be clearly mani-
fest. Sec. 295. The arrangement and classification of the
several sections of this Act have been made for the pur-
pose of a more convenient and orderly arrangement of the
same, and therefore no inference or presumption of a
legislative construction is to be drawn by reason of
the chapter under which any particular section · is
placed."

From this it is plain that § 152 of the Code applies to suits in the District Courts, as well as to those in the Court of Claims.

*Judgments affirmed.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of these cases.