*372 Upon defendant’s motion for new trial, which was denied June 29,1942, the following opinion was filed:
Madden, Judge,
concurring in the result:
The defendant seeks a new trial because the court held that the act conferring jurisdiction upon the court imposed a legal liability upon the Government, although there had been no such liability before the passage of the act, and left nothing for the court to do but determine the amount of plaintiff’s damage. The defendant urges that the language of the act and its legislative history show that Congress did not intend to create a new and special liability for the benefit of this plaintiff, but only to waive the statute of limitations and the immunity from suit which the Government would otherwise have had because its act was a tort, rather than a breach of contract, thus falling outside the ordinary jurisdiction of this court; that it required the court to hear and determine plaintiff’s claim upon its legal merits under existing applicable legal doctrines, and to deny plaintiff all recovery regardless of the amount of plaintiff’s damage if its claim did not have legal merit.
Upon reconsideration, I agree with the defendant’s contention as to the meaning of the jurisdictional act. The language of that act, which is quoted in full in the opinion of the court, contains no suggestion that the court should not examine the legal merits of plaintiff’s claim. It confers jurisdiction “to hear, determine and render judgment.” Language having no significant difference from this is commonly used in such special acts even though Congress intends only to provide a forum for the adjudication of a claim on its merits. See, for example, United States v. Mille Lac Band of Chippewa, 229 U. S. 498; Randall v. United States, 71 C. Cls. 152; Stanton & Jones v. United States, 68 C. Cls. 379. The title, “An Act for the Relief of the Norfolk Southern Railroad Company,” is satisfied by the waiver of the statute of limitations, which would otherwise have been an absolute bar to recovery, and the waiver of possible sovereign immunity because of the nature of the Government’s alleged wrong. That is the title commonly used by Congress for acts conferring jurisdiction on this court to hear the merits of claims barred by the statute *373 of limitations or for some other reason outside the regular jurisdiction of the court. See the cases cited sufra.
I find nothing in the legislative history of the act to contradict the usual meaning of its language. The controversy between plaintiff and the War Department as to whether plaintiff should be compensated for building the new bridge came to the attention of Congress shortly after the completion of the bridge in 1928. In 1929 Congressman Lankford and Senator Swanson introduced identical bills in the two Houses of Congress making direct appropriations to plaintiff of $103,419.23 to reimburse plaintiff for its expenditure for the bridge. These bills were referred to the respective Committees on Claims. Neither bill was reported out. The same thing occurred in 1931.
In January 1934 Congressman Darden and Senator Byrd introduced bills identical in language with those referred to above. On June 1, 1934, the House Committee on Claims reported its bill to the House and recommended its passage, with amendments not material here. The Committee report quoted letters from plaintiff supporting the legal merits of plaintiff’s claim and from the War Department denying those merits. The House took no action on the bill. On January 10,1935, Congressman Darden introduced a bill identical with the 1934 bill as amended by the Committee, making an appropriation to compensate plaintiff. Eleven days later he introduced another bill conferring jurisdiction on this court to “hear, consider and render judgment” on plaintiff’s claim. On January 28, 1935, Senator Byrd introduced in the Senate a bill identical with the latter of Congressman Darden’s bills, i. e., the bill conferring jurisdiction on this court.
On February 25,1935, the House Committee on Claims reported out Congressman Darden’s appropriation bill. The Beport was identical with that of the preceding year. When the bill came up in the House there were two objections which caused the bill to be recommitted to the Committee on Claims. This recommitted appropriation bill then was amended by the Committee by striking out the whole bill except its title and number and substituting for it, with unimportant amendments, the entire jurisdictional bill which *374 had been introduced, as we have seen, by Congressman Darden, on January 21. The bill was thereupon incorporated into the First Omnibus Claims Bill and reported to the House May 14, 1935.
The Committee’s report to the House said:
The committee had heretofore considered and reported this claim. In this Congress H. R. 3709 was reported carrying an appropriation of $103,419.23, which was the bill objected to. While your committee is definitely of the opinion that the claim has merit, the author of the bill now prefers that the claim be adjudicated by the Court of Claims, and we can see no objection to that procedure. While the former report is based on the appropriation bill, the facts are fully set out therein which give rise to this claim. At the end of said report, an opinion from the War Department on the present form of the bill is included.
As is indicated in the quoted language, the Committee incorporated in its report its former report on the appropriation bill, with the addition of a new communication from the War Department recommending against the passage of the bill. In 1936 this bill was passed and approved by the President.
The legislative history above recited seems to me to show that plaintiff, having grown weary of the repeated and unsuccessful efforts to obtain a direct appropriation, elected to take what it could get, its day in court on the merits of its claim. It had, from the beginning insisted on the legal merits of its claims in the face of the constant denial of those merits by the War Department. In the several Committee reports, the Committee said flatly that it agreed with plaintiff and not with the War Department as to plaintiff’s legal rights. It said in each of the reports:
6. That the requirement of Norfolk Southern Railroad Co. to comply with said order, and the taking of its property in widening said canal, was unmoral, inequitable, and unjust, and Norfolk Southern Railroad Co. has a moral, legal, and equitable claim against the United States of America for the expense to which it was put in complying with said order of the War Department.
*375 We seem, then, to have a situation where the Congress was not willing to make a direct appropriation by special act, but was willing that plaintiff should have its day in court. It passed an Act in language appropriate to express the latter intent. I think we should not interpret that Act to mean that Congress did substantially what it had repeatedly refused to do, approve payment to plaintiff leaving to the court only the amount of the payment. There is no evidence that the question of the amount, the only question left to this court according the Court’s opinion, was the question which troubled Congress. All the indications are that the question of whether plaintiff’s claim had legal merit, whether plaintiff or the War Department was right in the controversy pending for years before the Committee, was the question which Congress desired us to “hear, determine and render judgment” upon. Yet the Court holds that it cannot consider that question. I think we should consider it.
I concur in the result reached in the Court’s decision because I think plaintiff’s claim is a good legal claim. I use the term plaintiff in this opinion to designate the receivers or the Eailroad whose receivers they are. Before the Government acquired the Canal, plaintiff owned a 75-foot wide right-of-way for its railroad across a canal 50 feet wide, the canal being located inside the boundaries of a wider strip owned by the Canal Company. As appears in the opinion of the Court, the Canal Company was there first, and the predecessor of plaintiff acquired by condemnation a 40-foot strip crossing the Canal Company’s land and canal, and the right to erect a drawbridge over the canal. Plaintiff later, in 1890, by deed from the Canal Company acquired 35 feet of additional width for its crossing of the canal and its approaches thereto. The deed for the 35-foot strip seems to have been an outright conveyance of the title to the land so long as it should be used for railroad purposes. In 1891, plaintiff built a new drawbridge on the 35-foot strip, the canal being then about 50 feet wide. This bridge is the one which, in 1921, the defendant required plaintiff to remove and replace.
*376 In 1913, the United States acquired by purchase from the Canal Company its cut and right-of-way.
It is not entirely clear just what the technical titles of the various parties were. Probably the Canal Company originally owned its land in fee simple, and the Railroad Company when it acquired the right to cross the canal, obtained the fee simple to its strip of land determinable upon its ceasing to use the land for a railroad. See Tuckahoe Canal Co. v. Tuckahoe R. Co., 11 Leigh (Va.) 43. If so, the railroad’s possessory right was subject to the easement of the Canal Company to continue to maintain the canal as it then existed. If that was what the Canal Company had, that is all the United States obtained by purchase from it in 1913. The assertion of the Secretary of War that the Government, in widening the canal, was only “dredging away its own land” (see Record, p. 61), was not correct, if this was the state of the title. On the other hand, the Government was dredging away plaintiff’s land, and thereby creating an additional artificial channel which, in turn, caused plaintiff’s bridge and abutments to be an obstruction to navigation in the widened channel. For the cost of the changes made necessary by this taking of plaintiff’s land, plaintiff should have been compensated.
If the title was not as above supposed, it must have been that plaintiff railroad acquired, not the fee simple in possession of its strip across the canal land, but an easement of way to maintain a railroad and bridge. If so, I think it does not affect the result. Its easement, unqualified when it was acquired, was a right to maintain a bridge across the canal as the canal then was. It could not have been contemplated that without mention of any such reserved right in its conveyance to the railroad, the Canal Company could widen its canal whenever it pleased, even though it destroyed the railroad’s facilities or rendered them unusable. The railroad acquired a fixed and definite, even if incorporeal, property right, which the Canal Company could not destroy or damage with impunity. The United States, which in 1913 stepped into the shoes of the Canal Company, had no greater right. On this assumption as to the title, the statement of the Secretary of War quoted above that the Government was only *377 “dredging away its own land” would in a sense be true, but would be immaterial. It would be as if one, having granted an easement to another for a way for heavy trucks across his land, should by undermining the way make it unusable. His statement that he was only digging “his own” soil would be beside the point. The important thing would be that he was destroying another man’s property, his easement.
The doctrine enunciated by the Supreme Court in the Monongahela Bridge case and the other cases cited in the opinion of the Court does not, I think, apply here. They hold, as I understand them, that one who builds his bridge or other structure where it interferes with the navigation of a navigable stream as it then exists, or as it may be improved by changes made within the scope of the existing public easement, may be required to remove the interfering structure without compensation. But where the Government desires to use additional land for the purpose of furthering navigation, it cannot require the owner of that land to donate the land, nor to destroy the existing structures on it, in order to make navigation possible where there was neither navigation nor the right to navigate before. United States v. Chicago, M., St. P. & P. R. Co., 312 U. S. 592, 599; United States v. Cress, 243 U. S. 316, 321 ff.; United States v. Chicago, B. & Q. R. Co., (C. C. A. 8th) 82 F. (2d) 131, 106 A. L. R. 942, cert. denied 298 U. S. 689; Delaware R. Co. v. Weeks, (D. C. Dela.) 293 Fed. 114, 119, 121.
The notice given plaintiff in 1921 by the Secretary of War did not say, nor could it properly have said, that plaintiff’s drawbridge was an interference with navigation of the canal at its then width. It said rather that the “alteration * * * is required to render navigation through or under said bridge, upon completion of the aforesaid project of improvement, reasonably free, easy and unobstructed * * [Italics supplied.]
My conclusion is, therefore, that the Government, in order to obtain the navigable channel which it desired, found it necessary to destroy or compel the alteration of plaintiff’s bridge which plaintiff was rightfully maintaining, and that the Government was under a duty to compensate plaintiff.