UNITED STATES of America, Plaintiff,

v.

ALAMEDA GATEWAY, LTD., Defendant.

No. C–96–1780 MHP.

United States District Court, N.D. California.

Aug. 1, 1996.

Charles M. O'Connor, Michael J. Yamaguchi, U.S. Atty., U.S. Attorney's Office, San Francisco, CA, Lois J. Schiffer, U.S. Department of Justice, Environment & Natural Resources Division, General Litigation Section, Washington, DC, H. Michael Semler, U.S. Dept. of Justice, Environmental Defense Section Environment and Natural Resources Division, Washington, DC, for U.S.

James M. Berg, F. Gale Connor, Berg Ziegler Anderson & Parker, San Francisco, CA, for Alameda Gateway Ltd.

## MEMORANDUM AND ORDER

PATEL, District Judge.

Plaintiff United States of America brought this action against defendant Alameda Gateway, Ltd., ("Gateway") alleging that Gateway's refusal to remove portions of two piers in Oakland's Inner Harbor is a violation of the Rivers and Harbors Act of 1899 ("RHA"), 33 U.S.C. §§ 403, 406. Now before the court is the United States' motion for an injunction barring Gateway from obstructing, hindering or interfering with the Army Corps of Engineers' plans to remove the ends of the two piers in order to create a new turning basin.

Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

### Findings of Fact

Gateway is a California limited partnership based in Alameda, California. Gateway owns a 29 acre marine industrial site on the Alameda side of the Oakland Inner Harbor. When Gateway acquired the site from Todd Shipyards in 1983, it acquired two piers, a western and an eastern pier, each extending approximately 600 feet into the Harbor.[1] The western pier stands in large part on

---

1. In the late 1930's, United Engineering, Todd Shipyards' predecessor, dredged ninety-five percent of the basin, as it currently exists, in two phases. United Engineering did not secure the Corps' permission for this dredging work. Later, United Engineering dredged the remaining five percent of the basin with some help from the Navy. After the completion of this dredging work, United Engineering built the two piers. By the time Gateway purchased the property from a subsequent owner, the western pier was being used for the berthing of vessels and the eastern pier was badly dilapidated.

submerged portions of Gateway's property and in part on submerged land which Gateway leases from the City of Alameda. The eastern pier stands entirely on submerged portions of Gateway's property and is badly deteriorated.

In 1985, Gateway sought a permit from the Army Corps of Engineers ("the Corps") to develop the property into a marina that would house various commercial and industrial facilities. The Corps refused to issue the permit to Gateway, claiming that it would eventually need the property for a proposed development project in the Oakland Harbor. Gateway sued the Corps over denial of the development permit in case number C–85–8802 MHP. The court has determined that the instant action is related to C–85–8802. Gateway contends that certain factual issues determined during the prior action are relevant to this dispute.[2]

In 1986 Congress formalized the proposed "Harbor Improvement Project" when it authorized the Corps to widen and deepen the shipping channels of the Oakland Inner and Outer Harbors. Defendants' Request for Judicial Notice, Ex. E (Water Resources Development Act of 1986 § 202, P.L. 99–662, 100 Stat. 4082, 4092 (November 17, 1986)). The project provides the City of Oakland with federal support in its efforts to maintain a competitive port. In recent years Oakland has lost twenty-three percent of its shipping contracts to other Pacific ports that offer better conditions to a new generation of deep-draft cargo vessels. Brien Dec. at ¶ 2. Currently, deeper vessels can only enter the Oakland Harbor during high tide and when they are not fully loaded. By increasing the Port's accessibility to these deeper vessels, the United States and Oakland hope to increase the volume of cargo coming into Oakland and to create revenue and jobs.

Pursuant to this Harbor Improvement Project, the Corps will dredge a new turning basin in the portion of the Inner Harbor in which Gateway's piers stand. The turning basin currently used by cargo vessels making their way back to the Pacific is located several miles upstream and is not easily accessible. Brien Dec. at ¶ 6. After extensive research and testing to identify a location in the Inner Harbor that would require minimal interference, the Corps determined that the planned site is the only space wide enough to allow ships to turn around safely without the inconvenience of travelling one and one-half hours upstream to the existing turning basin. Plaintiffs estimate that the turning basin will be approximately 1,200 feet in diameter, slightly below the diameter ordinarily required by the Corps. Rakstins Dec. at ¶¶ 4 and 6. In order to accommodate the turning basin, the western pier will need to be shortened by three hundred feet and the eastern pier by two hundred feet.

Gateway currently leases the western pier to third parties but makes only minimal use of the eastern pier. After the Corps denied Gateway's marina development proposal in the mid–1980's, Gateway sought a permit for maintenance work on the eastern pier. The Corps agreed to grant the maintenance permit only on the condition that the pier be removed once the Corps was prepared to proceed with dredging to create the turning basin. Beery Dec. at ¶ 4. Gateway chose to defer the maintenance work until resolution of this dispute. Short and long term leases of the western pier and limited leases of the eastern pier currently generate revenues of up to $40,000 each month.

On August 21, 1995, the Corps informed Gateway that it was moving the harbor line shoreward pursuant to the sections 10 and 11 of the RHA, 33 U.S.C. §§ 403 and 404, and that portions of the two piers would need to be removed in order to create the new turning basin. Fong Dec., Ex. D–1 at 1.[3] Corps

---

2. In a Response to Plaintiff's Notice of Related Case filed on May 24, 1996, Gateway argued that because there was no overlap between the issues in the two actions, the consolidation of the two actions would serve no useful purpose. Gateway apparently has abandoned its prior position and invokes the related action throughout its Opposition.

3. It is not clear to the court why the Corps revised the harbor lines prior to claiming that the piers constituted obstructions to navigable waters. Since May 27, 1970, the Corps has required that permits be issued for any work that is conducted shoreward of established harbor lines. The Corps maintains, however, that harbor lines are considered only as guidance for assessing

officials subsequently determined that the removal would not be a regulatory taking because it is an exercise of a navigational servitude to which the piers have always been subject.[4] Fong Dec., Ex. D–1 at 4. The Corps directed Gateway to submit a plan for the removal of portions of the piers that interfere with the turning basin, at no cost to the Corps, by June 2, 1995.[5] Gateway refused to submit the plan, and the Corps determined that in order to follow the strict schedule of the dredging project, it would solicit bids on its own for the pier removal.[6]

The Corps has determined that the pier ends must be removed by September 14, 1996, when the dredging of the new turning basin is set to begin. Accordingly, the United States filed the instant action seeking a preliminary injunction barring Gateway from interfering with the Corps' plans to remove the pier ends. Gateway has not objected to the proposed injunction on the ground that no obstruction has yet occurred. Gateway admitted at a hearing on July 12, 1996 that it will obstruct the Corps' efforts to remove the pier ends unless the Corps obtains court authorization for the removal. Gateway also has impeded the Corps' efforts to remove the piers by refusing to allow prospective contractors access to the piers. This has caused the estimated cost of removal to rise considerably.

On May 17, 1996, the United States filed its motion for a preliminary injunction. Gateway responded by filing an ex parte motion to continue the hearing and for leave to commence discovery. Prior to any court rulings, the parties agreed to continue the June 21, 1996 hearing date in order to allow

Gateway to conduct discovery. The hearing was reset for July 12, 1996, and on May 17, 1996, Gateway filed an opposition to the United States' motion for a preliminary injunction.[7]

The foregoing factual summations are deemed to be findings of fact for the purposes of Federal Rules of Civil Procedure 52 and 65. To the extent that the discussion below contains factual conclusions, they are deemed findings of fact for these purposes as well.

*LEGAL STANDARD*

In order to obtain a preliminary injunction in this circuit, the moving party is required to demonstrate either: (1) probable success on the merits and a significant threat of irreparable harm or (2) serious questions on the merits and the balance of hardships tipping in its favor. *See United States v. Nutri-cology, Inc.,* 982 F.2d 394, 397 (9th Cir.1992); *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992); *United States v. Odessa Union Warehouse Co-op,* 833 F.2d 172, 174 (9th Cir.1987). As the likelihood of irreparable harm increases, the required degree of probable success decreases. *Odessa,* 833 F.2d at 176.

In statutory enforcement actions, however, the standard for granting a preliminary injunction differs. When the government demonstrates that it will probably prevail on the merits, it is entitled to a presumption of irreparable injury. *Nutri-cology,* 982 F.2d at 398. The court only inquires as to the possibility of irreparable harm when the government fails to establish a likelihood of success on the merits.

impacts on navigation. It would seem, therefore, that the Corps could determine that the piers are an obstruction even without altering the harbor lines.

4. *The Corps made this determination pursuant to* a Takings Implication Assessment as it was required to do by Executive Order 12630, 53 Fed. Reg. 8859 (March 18, 1988).

5. The Corps subsequently extended the date by which the plan was to be submitted to December 1, 1995 and again to December 5, 1995.

6. Although the Corps has decided to solicit bids for the pier removal on its own, the Corps does

not forego its right to recover from Alameda the costs of the pier removal at a later time.

7. Gateway correctly suggests that the procedural context in which this motion was brought differs from ordinary injunctions in that an injunction will not preserve the status quo pending a trial on the merits. *See Joyce v. City and County of San Francisco,* 846 F.Supp. 843, 850 (N.D.Cal. 1994). Because Gateway has not moved for a preliminary injunction barring the Corps' removal of the pier ends, however, this court will not consider whether Gateway is entitled to prevent the Corps from obstructing the pier removal.

Where the government makes only a "colorable evidentiary showing" of a statutory violation, however, the court does consider whether the government has shown a likelihood of irreparable harm. *Id.* (quoting *Odessa*, 833 F.2d at 175).

*DISCUSSION*

The Corps of Engineers argues that it is likely to prevail on the merits because the pier ends constitute obstructions to navigable waters that may be removed by the Corps pursuant to section 10 of the RHA, 33 U.S.C. § 403. The Corps argues that because this is a statutory enforcement action, it is entitled to a presumption of irreparable harm once it has shown a likelihood of success. Even if a showing of irreparable harm were required, the Corps avers that it could make such a showing based on the serious harm that would be incurred should the completion of the turning basin be delayed any further.

Gateway contends that the Corps is not likely to prevail on the merits and therefore is not entitled to a presumption of irreparable harm. Gateway asserts that section 10 of the RHA does not prohibit the maintenance of obstructive structures but only the erection of such structures. Apparently conceding that the Corps' assertion of a federal navigational servitude over the property on which the piers stand would allow it to evade the Takings Clause of the Fifth Amendment, Gateway contends that its property is not burdened by a navigational servitude because the piers were built with the consent of the government and with an expectation that they could not be removed in violation of the Fifth Amendment. If such a servitude existed previously, Gateway claims that it was surrendered when prior to the turn of the century Gateway's predecessor filled much of what is today the site of the proposed turning basin. Gateway further argues that the Corps fails to make the requisite showing that it will suffer irreparable harm if its request for an injunction is denied.

I. *Likelihood of Prevailing on the Merits*

In order to prevail on the merits, the United States must show that the portions of the two piers that stand within the amended harbor line constitute structures under section 403. Under the RHA, such structures are presumed to be obstructions to the navigable capacity of a waterway. *United States v. Boyden,* 696 F.2d 685, 687 (9th Cir.1983) ("the building activities mentioned in clauses 2 and 3 [of Section 10 of the RHA, 33 U.S.C. § 403] are *presumed* to be obstructions to navigable capacity") (quoting *Sierra Club v. Andrus,* 610 F.2d 581, 594–95 (9th Cir.1979), *rev'd on other grounds sub nom. California v. Sierra Club,* 449 U.S. 818, 101 S.Ct. 68, 66 L.Ed.2d 19 (1981)). Once an obstruction to navigable waters is presumed, the Corps must then show that it has the power to remove those obstructions.

A. *The Removal of Structures under the Rivers and Harbors Act*

Gateway avers that the United States has no authority under the RHA to remove the portions of the piers that extend beyond the amended harbor line. It argues that sections 403 and 406 of the RHA prohibit only the creation or erection of structures that constitute an unauthorized obstruction, *not* the maintenance of such structures. Gateway contends that the government may not obtain injunctive relief against structures that were built lawfully but subsequently found to violate the RHA.

The Corps suggests a broader reading of the RHA, claiming that section 403 makes it unlawful to place *or* maintain any obstruction to the navigable capacity of any waters except as authorized by the Corps. While the word "maintain" is not found in section 403 itself, the Corps avers that prior decisions have made clear that the RHA authorizes the removal of any structures that violate section 403, even those that were constructed lawfully.

■ Gateway's interpretation of the RHA is supported neither by logic nor by precedent. As the United States correctly argues, the purpose of the RHA is to grant the Corps broad discretion over the navigable waters of the United States. *United States v. Alaska,* 503 U.S. 569, 578–80, 112 S.Ct. 1606, 1612, 118 L.Ed.2d 222 (1992) ("We read the 1899 Act charitably in light of the pur-

pose to be served.") (quoting *United States v. Republic Steel Corp.*, 362 U.S. 482, 491, 80 S.Ct. 884, 890, 4 L.Ed.2d 903 (1960)). To deem the RHA inapplicable to pre-existing structures would sharply restrict the ability of the government to preserve the public interest in maintaining unimpeded access to the navigable waters of the United States.

The appropriate test for determining the geographic limits of navigable waters under 33 C.F.R. § 329 is quite broad:

> Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate commerce.

Although Gateway correctly states that the definition of "navigable waters of the United States" is imprecise and dependent on judicial determination, the Ninth Circuit has affirmed the definition in 33 C.F.R. § 329. *See Leslie Salt Co. v. Froehlke*, 578 F.2d 742, 753 (9th Cir.1978) (defining navigable waters as "all places covered by the ebb and flow of the tide to the mean high water (MHW) mark in its unobstructed, natural state").

The fact that the disputed property once was not entirely submerged underwater does not immunize it from regulatory jurisdiction, which "extends to the entire surface and bed of all waterbodies subject to tidal action ... even though portions of such waterbodies may be extremely shallow." 33 C.F.R. § 329.12(b). Once made, a determination of navigability applies over the entire surface of the water and "is not extinguished by later actions or events which impede or destroy the navigable capacity." 33 C.F.R. § 209.260(c). Under this broad definition, the waters in which Gateway's piers stand are clearly navigable.

■ There is ample authority that under the RHA the government can remove structures that were erected lawfully but subsequently found to be in navigable waters under the RHA. *See, e.g., Greenleaf–Johnson Lumber v. Garrison*, 237 U.S. 251, 35 S.Ct. 551, 59 L.Ed. 939 (1915) (holding that Secretary of War could not be enjoined from redrawing harbor lines effectively forcing owner to remove 200 feet of lawfully constructed

wharf that obstructed channel widening and deepening project); *Donnell v. U.S.*, 834 F.Supp. 19, 25–27 (D.Me.1993) (holding that Corps may order wharf owners to remove portion of legally constructed wharf in navigable waters to allow for construction of dock); *Blake v. United States*, 181 F.Supp. 584, 588 (E.D.Va.1960) ("[W]here in the judgement of Congress, or its agents, a structure appears in a navigable stream which may affect the regulation of commerce, it is subject to the dominant power to cause the removal of such structure, even though the structure be 'private property' and originally not unlawful."), *aff'd* 295 F.2d 91 (4th Cir.1961).

■ The government may require substantial and expensive alterations to be made to lawfully created structures when they are found to interfere with access to navigable waters. *See Monongahela Bridge Co. v. United States*, 216 U.S. 177, 194, 30 S.Ct. 356, 360–61, 54 L.Ed. 435 (1910) (holding that government has right to remove unreasonable obstructions to navigation and may order removal of bridge); *Union Bridge Co. v. United States*, 204 U.S. 364, 400, 27 S.Ct. 367, 380, 51 L.Ed. 523 (1907) (holding that government could demand without providing compensation that bridge built under state authority be altered at great expense to owner); *West Chicago Railroad v. Chicago*, 201 U.S. 506, 516, 26 S.Ct. 518, 519, 50 L.Ed. 845 (1906) (preserving government's right to require the removal or reconstruction of tunnel under Chicago river that had been constructed with permission of Chicago).

■ Finally, the government may be compensated for removing obstructions to navigation when their owners refuse to remove them. *See United States v. Perma Paving Co.*, 332 F.2d 754, 758 (2nd Cir.1964) (holding that government was entitled to recover costs for removal of shoal in navigable channel); *United States v. Illinois Terminal R.R. Co.*, 501 F.Supp. 18, 20–21 (1980) (holding that government may recover expenses incurred in removal of lawfully erected bridge piers found to be obstruction under section 403).

In light of the substantial authority permitting the government to remove obstacles to navigable waters under the RHA, whether constructed lawfully or not, the court finds that the Corps is likely to prevail on the merits.

### B. *Navigational Servitude and the Takings Clause of the Fifth Amendment*

Gateway next argues that the Takings Clause of the Fifth Amendment prevents the Corps from removing portions of the piers without compensation because it does not possess a federal navigational servitude over the waters in which the piers stand. *United States v. Cress,* 243 U.S. 316, 320, 37 S.Ct. 380, 381–82, 61 L.Ed. 746 (1917) (holding that private property in beds and shores of navigable streams is subject to the exercise of the public right of navigation).

■ A navigational servitude embodies the concept that the public's right of navigation supersedes claims of private ownership. *Cress,* 243 U.S. at 320, 37 S.Ct. at 381–82. This public right of navigation affords the government a "privilege to appropriate without compensation which attaches to the exercise of the 'power of the government to control and regulate navigable waters in the interest of commerce.'" *United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 627–28, 81 S.Ct. 784, 787–88, 5 L.Ed.2d 838 (1961) (quoting *United States v. Commodore Park, Inc.,* 324 U.S. 386, 390, 65 S.Ct. 803, 805, 89 L.Ed. 1017 (1945)).

■ The terms "navigational servitude" and "navigable waters" are not coextensive. A navigational servitude is distinct from Congress' power to regulate navigable waterways. *Boone v. United States,* 944 F.2d 1489, 1493 (9th Cir.1991). The fact that Congress has provided for regulation of navigation or navigation capacity in certain navigable waters does not necessarily mean that the United States has a navigational servitude in those waters or related lands. *See Kaiser Aetna, et al. v. United States,* 444

U.S. 164, 170–73, 100 S.Ct. 383, 387–89, 62 L.Ed.2d 332 (1979). In *Kaiser Aetna* the Supreme Court declared that a navigational servitude is "an expression of the notion that the determination whether a taking has occurred must take into consideration the important public interest in the flow of interstate waters that in their natural condition are in fact capable of supporting public navigation". *Id.* at 175, 100 S.Ct. at 390. The court distinguishes this from "ordinary regulation or improvement for navigation". *Id.* at 178, 100 S.Ct. at 392.

The court agrees with the Corps' contention that the scope of its navigational servitude is not at issue in this motion. The question here is the right of the Corps under sections 404 and 406 to remove the piers as obstructions to navigable waters. Any claims Gateway has for asserting a taking or for compensation on a takings or any other theory must be asserted in the United States Court of Federal Claims.[8] 28 U.S.C. § 1491; *United States v. Mitchell,* 445 U.S. 535, 540 n. 2, 100 S.Ct. 1349, 1352, 63 L.Ed.2d 607 (1980); *United States v. Sasser,* 967 F.2d 993, 998 (4th Cir.1992).

Gateway does not couch its takings argument in the context of a claim for monetary compensation, but rather attempts to use the takings issue to show that plaintiff is not likely to prevail on the merits. Whether the government's removal of the pier ends amounts to a compensable taking and whether this taking is justified by the exercise of a navigational servitude are not relevant inquiries in the determination of plaintiffs' likelihood of success on the merits. Defendant may raise these issues in a subsequent takings claim with the Court of Federal Claims. The sole issue relevant to determining the likelihood that the government will prevail on the merits is the strength of its claims under the RHA. Therefore, the court does not reach Gateway's arguments that the piers cannot be removed without compensation or that the government either never had or lost

---

**8.** The Corps has, in prior correspondence with Gateway, asserted that the removal of the pier ends is not a taking because the government possesses a navigational servitude over the waters in which the piers stand. Fong Dec., Ex. D–

1 at 4. At the July 12, 1996 hearing, however, the Corps agreed that the scope of the government's navigational servitude is not relevant to the motion currently before the court.

a navigational servitude over the waters on which the piers stand, except to the extent that these issues are relevant to the Corps' statutory authority under the RHA.[9]

## C. Failure to Acquire Private Property Prior to Securing Dredging Contract

Gateway next raises a number of issues that do not bear directly on the merits of plaintiff's claim but may touch upon the propriety of equitable relief. Gateway's first contention suggests bad faith on the part of the Corps. Gateway accuses the Corps of intentionally circumventing the costs involved in purchasing the Gateway property by amending the harbor lines and invoking a navigational servitude over the waters within those amended lines. Defendant points to several reports and planning documents indicating that the Corps was aware of the possibility that it would need to purchase the property on which the piers are located in order to build the turning basin. Connor Dec. at ¶ 5 and Ex. H; Beery Dec. at ¶ 6 and Ex. B. While the government did at one time appear to be exploring the purchase of needed space for the turning basin, this fact alone does not defeat its present effort to remove the piers by invoking its rights under sections 10 and 11 of the RHA. Nor do the governments' internal planning memoranda limit it in any way from exercising its statutory right to obtain injunctive relief under the RHA.

Gateway contends moreover that the Water Resources Development Act of 1986 requires the City of Oakland, not the United States, to acquire whatever private property is needed for the Harbor Improvement Project. 33 U.S.C. § 2211(a)(3). Gateway also claims that the Corps circumvented a December 9, 1994 Project Cooperation Agreement between the Department of the Army and the City of Oakland in which the City of Oakland agreed to secure all necessary rights of way for the project. Connor Dec., Ex. G, Article II(C) at 9. According to 33 U.S.C. § 592 and the Project Cooperation Agreement, in the event that Oakland was unable to secure such title, Oakland could request that the Corps attempt to acquire any necessary rights of way at Oakland's expense by condemnation proceedings. Connor Dec., Ex. G, Article II(D).

Gateway's argument that the Corps' agreement with Oakland prevents it from exercising its statutory authority under the RHA is meritless. To begin with Gateway has no standing to enforce an agreement executed solely between the Corps and the City of Oakland. Gateway has made no showing that it has an enforceable interest as a third-party beneficiary or in any other capacity. Even assuming that a third-party beneficiary could enforce the agreement, however, Gateway fails to show that, by contracting with the City, the Corps lost its authority under section 404 of the RHA to revise harbor lines as needed for the preservation and protection

9. Gateway relies heavily on *United States v. Stoeco Homes*, 498 F.2d 597, 610 (3rd Cir.1974). However, that case is inapposite and is factually distinguishable. *Stoeco* was premised mainly on whether there was a navigational servitude that gave the government the right to require a permit under section 407 of the RHA or whether the government had surrendered its servitude when it allowed the owner of a salt marsh formerly subject to the ebb and flow of tides to fill his property. Once it lost its servitude, the government could no longer pursue injunctive relief under the RHA barring the owner from developing the property when the silting effects of the development obstructed navigation.

The question of a servitude does not arise here. It is strictly a question of the application of a regulatory statute over navigable waters. Furthermore, *Stoeco*'s holding was explicitly limited to "tidal marshlands which had become fast dry land prior to the change in policy of the Army

Corps of Engineers." *Id.* at 611. By 1970, when the Corps changed its policy, the property on which the two piers in this case stand had long since been dredged by defendant's predecessor. Because the dredging already was completed by the time the army changed its policy, the property was not fast dry land in 1970 and therefore could not be subject to the holding of *Stoeco*.

Finally, *Stoeco* arguably undermines plaintiff's argument. *Stoeco* clearly underscores that, prior to the passage of the two statutes involved in that case, the chief concerns of the Corps were "the prevention of encroachments on the navigational capacity of waters, and the prevention of encroachments on the navigational servitude which the government intended to use for some other purpose, such as flood control ... or road building." *Stoeco*, 498 F.2d at 606. This is exactly what is involved in the case at bar. *Stoeco* does not mandate a different conclusion.

of harbors and under section 406 to seek by injunction the removal of any structures erected in violation of the pertinent sections of the RHA. The language of the agreement does not appear to indicate that the Corps waived its authority under the RHA. Finally, the terms of the agreement as it relates to the issue here are so general that they provide no factual support for defendant's contention. There is no provision specifically addressing the status of the piers in question.

Accordingly, the court does not agree with defendant's contention that enjoining Gateway from obstructing the removal of the pier ends would reward plaintiff's bad faith.

## II. *Irreparable Injury*

Having established that it is likely to succeed on the merits, the Corps is entitled to a presumption of irreparable injury. Even if this were not a statutory enforcement action, however, the Corps would be able to show that it stands to suffer irreparable harm. Until the dredging of the turning basin is completed, the entire Harbor Improvement Project is effectively forestalled. In addition, the Corps has presented evidence that it will have to pay its contractors approximately $17,500 for each day that the dredging is delayed to compensate for stand-down time for crews and equipment. Rakstins Dec. at ¶ 12.

Gateway contests all of the Corps' proffered reasons for why it stands to suffer irreparable harm should an injunction be denied. Gateway contends that further delay on the pier removal will not drag the Harbor Improvement Project very far off schedule because other factors, unrelated to this dispute, have already caused considerable delay of the project. Gateway further argues that the Corps does not stand to suffer irreparable economic injury because the alleged "contract" damages will not be levied. Gateway finally contends that any hardship suffered by the government is of its own making.

The court is not persuaded by Gateway's attempts to minimize the impact of its refusal to comply with the Corps' directives. The presence of other factors threatening to delay the completion of the turning basin—such as difficulty in obtaining equipment or the discovery of additional areas to be dredged—does not strengthen defendant's defense. Next, whether the expenses the Corps will be forced to incur are characterized as "contractual damages" or costs for stand-down time for crew and equipment does not alter the fact that delay will increase the cost of the project. Finally, Gateway's argument that it should not be forced to bear the expense of a hardship that the government itself created is baseless. As the record in the related case demonstrates, Gateway was warned over ten years ago of Congress' plans to create a turning basin that would require the removal of the pier ends. The Corps gave Gateway advance notice of the exact date by which the piers would need to be removed. Meanwhile, Gateway has been able to profit from the lease of its piers.

The court also has considered the injury Gateway stands to suffer if the injunction is granted. While monthly revenues of up to $40,000 are not trivial, the court is confident that, should Gateway prevail in its takings claim, it will receive adequate compensation for its losses. More importantly, the injury Gateway contends it will suffer should the pier ends be removed is minimal in view of the public interest in avoiding any further delay to the Harbor Improvement Project.

The foregoing Legal Standard and Discussion sections of this memorandum and order, as well as any legal conclusions in the Findings of Fact section, are deemed to be conclusions of law for the purposes of Federal Rules of Civil Procedure 52 and 65.

## CONCLUSION

For the foregoing reasons, the court hereby GRANTS the United States' motion for a preliminary injunction barring Gateway from interfering with or preventing the removal of the pier ends that stand within the revised harbor line of the Oakland Inner Harbor.

These findings, conclusions and reasons constitute the reasons required by Rule 65 to support the attached Preliminary Injunction and are deemed incorporated therein.

IT IS SO ORDERED.